

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-10-2000

# Tillman v. Lebanon Co. Corr. Facility

Precedential or Non-Precedential:

Docket 99-3656

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Tillman v. Lebanon Co. Corr. Facility" (2000). *2000 Decisions.* Paper 95.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/95

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 10, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3656

LEONARD G. TILLMAN,
        Appellant

v.

LEBANON COUNTY CORRECTIONAL FACILITY;
ROBERT L. RAIGER, Warden

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Civ. No. 98-cv-01188)
District Judge: Honorable William W. Caldwell

Argued January 31, 2000

Before: MANSMANN, NYGAARD, and RENDELL,
Circuit Judges.

(Filed: May 10, 2000)

        Donald A. Bailey, Esquire (Argued)
        3540 N. Progress Avenue
        Suite 209
        Harrisburg, PA 17110

         Counsel for Appellant

        Todd B. Narvol, Esquire (Argued)
        Thomas, Thomas & Hafer, LLP
        305 N. Front Street
        P.O. Box 999
        Harrisburg, PA 17108-0999

         Counsel for Appellees

OPINION OF THE COURT

MANSMANN, Circuit Judge.

Leonard G. Tillman is a former prisoner who was assessed a fee of $10.00 per day for housing costs stemming from two periods of incarceration in a county facility for state parole violations. When Tillman was confined for the second term, officials confiscated half of the funds in his wallet and half of all funds sent on his behalf, in order to pay for the assessments. Tillman ultimately accumulated a debt exceeding $4,000.00, for which his account was turned over to a collection agency after his release from prison.

In a pro se complaint filed against the prison and its warden, Tillman alleged that the levying and collection of these sums violated 42 U.S.C. S 1983. The defendants moved for dismissal, or in the alternative, for summary judgment, but the Magistrate Judge recommended denial of the motion on the basis of an analysis of the Eighth and Fourteenth Amendments. After the defendants filed supplemental affidavits, the District Court granted summary judgment and dismissed the complaint. We will affirm.

I. Facts

The underlying facts are, as Tillman concedes, "essentially undisputed." After committing unspecified parole violations, Tillman was incarcerated in the Lebanon County Correctional Facility in Pennsylvania between January 30, 1997 and August 21, 1997. Parole was again granted, but similar violations led to his recommitment to the same facility on October 24, 1997.

Upon recommitment, prison authorities confiscated half of the money in Tillman's wallet and subsequently took half of all funds sent on his behalf. These actions were taken pursuant to the facility's Cost Recovery Program. Under this program, prisoners are assessed a daily charge of $10.00 towards their housing expenses. Any money

2

generated through the program goes into the county's general fund, which pays the facility's operating costs.

Significantly, the availability of prison services is not contingent upon keeping a clean account. Failure to pay does not result in the denial of room, board, clothing, or other services. Neither can it result in extended prison time or reincarceration.

Instead, when a prisoner lacks sufficient funds to pay the assessments, a negative account balance is created. Authorities may then take half of any funds, from any source, sent to a prisoner in order to satisfy the negative balance. Any remainder is credited to the prisoner's inmate account for his or her personal use.

If there is still an outstanding negative balance upon a prisoner's release from jail, any funds remaining in his or her inmate account are put towards the debt. If any debt still remains unpaid upon release, the ex-prisoner remains responsible for the debt as a civil liability. The prison attempts to work out a payment plan, but if the debt remains unpaid after release, the account may be turned over to a collection agency. Warden Robert L. Raiger notes in an affidavit, however, that an account will not be turned over for collection if the ex-prisoner maintains a minimal payment such as $5.00 per week. The outstanding balance is also kept on the prison's records, so if the ex-prisoner is later reincarcerated, the prior debt remains in full force while new debt begins to accumulate.

Because Tillman had not paid off the assessments from his previous term of incarceration, he had an outstanding balance upon recommitment. Consequently, as noted, authorities confiscated half the money in his possession and took half of all funds sent on his behalf to satisfy the debt. The confiscated funds still did not satisfy the assessments, however, leaving the plaintiff with a debt of over $4,000.00 after his final discharge in July of 1998. His account was ultimately turned over to a collection agency.

Not all prisoners fall within the Cost Recovery Program. "Trusty" inmates, who perform work assignments that are essential to the day-to-day operation of the prison, are excused from the program. Also excused are prisoners

participating in the Work Release Program because they are already required to pay a minimum of $70.00 per week towards their room and board.

Authorities mistakenly failed to assess the fees against one inmate, Anthony Ashford, who had previously been exempt as a work release prisoner. After Ashford was removed from the Work Release Program, authorities neglected to begin charges under the Cost Recovery Program. Upon receiving notice via the plaintiff 's complaint, however, they back-charged Ashford's account.

The Cost Recovery Program had been put into effect prior to both terms of the plaintiff 's parole violation incarceration. It was adopted by the Lebanon County Prison Board on June 19, 1996, and effective July 1 of that year. At that time, a memorandum regarding the program and a copy of the program itself were posted throughout the prison. When Tillman was incarcerated in January of 1997, these notices were still posted in all cell blocks, including the one to which he had access.

At that time, Tillman was also given an inmate handbook detailing the prison's grievance program, which allowed prisoners to "state any grievance concerning any matter you feel is unjust . . . ." In June of 1997, during the plaintiff 's initial term of parole violation incarceration, the handbook was updated to include a description of the Cost Recovery Program, as well as an expanded grievance program that allowed for direct appeal to the warden. The plaintiff was given a copy of the updated handbook, and upon recommitment in October of 1997, was again provided with a copy.

Although prisoners were assessed $10.00 per day through the Cost Recovery Program, the actual cost of the plaintiff 's room and board amounted to $32.00 per day. Incarcerated in a county facility, however, the plaintiff here was a state prisoner. Although the plaintiff 's pro se complaint alleged that the state reimbursed the county prison for his costs of incarceration, an affidavit filed by Lebanon County Commissioner William G. Carpenter states that no such repayment is given to the county facility for prisoners who are committed for state parole violations.

4

While still incarcerated,[1] the plaintiff filed a pro se complaint in the United States District Court for the Middle District of Pennsylvania on July 22, 1998. He named as defendants Warden Raiger and the Lebanon County Correctional Facility. In the complaint, the plaintiff charged violations of 42 U.S.C. S 1983 arising from the daily assessments, which were imposed despite the alleged fact that the "[s]tate pays county" for his expenses. He further claimed that the prison took half the money in his wallet and half of the money orders "sent in to help me live better." He complained that "some" inmates were not charged and that prisoner Anthony Ashford was neither charged nor had any money taken from him. Tillman also made cursory references to assessments for medical treatment and to "false incarceration."

After the plaintiff was granted permission to proceed in forma pauperis, the defendants moved for dismissal under Fed. R. Civ. P. 12(b)(6), or in the alternative, for summary judgment under Rule 56(c). Counsel subsequently entered an appearance on the plaintiff 's behalf andfiled a response.

A Magistrate Judge treated the defendants' motion as one for summary judgment and in a memorandum opinionfiled April 9, 1999, recommended that the motion be denied. Although Tillman did not specify any particular legal theory or authority in his response, the Magistrate Judge engaged in a detailed analysis of the Eighth and Fourteenth Amendments. First, held the Magistrate Judge, although prisoners could avoid medical fees by declining to seek treatment, they could not avoid residing in an institution. That fact and the amount of debt created a triable question of fact regarding cruel and unusual punishment. Second, it could not be shown as a matter of law that the fees were not excessive fines in violation of the Eighth Amendment. Third, the defendants failed to demonstrate what due process, if any, was provided to the plaintiff. Finally, the Court held that it lacked sufficient information to conclude that there was no material question of fact regarding any equal protection claim.

_____

1. The plaintiff was subsequently released on July 25, 1998 because of the expiration of the maximum underlying sentence.

The defendants objected to the Magistrate Judge's report and filed supplemental affidavits from Warden Raiger and Commissioner Carpenter. They detailed the notice given to prisoners, the availability of grievance procedures, and asserted that the prison was not reimbursed by the state for maintenance expenses. The defendants provided copies of relevant sections from the superceded and updated prisoner handbooks. They also stated that the Cost Recovery Program was not intended to punish, but rather to rehabilitate by teaching inmates financial responsibility by sharing in the costs of their food, housing, clothes, and protection.

The District Court granted summary judgment to the defendants and dismissed the plaintiff 's complaint in an opinion filed on August 2, 1999. Due in part to the additional evidence, the District Court took a very different approach to the case. First, as to the claim of cruel and unusual punishment, the Court found dispositive our opinion in Reynolds v. Wagner, 128 F.3d 166 (3d Cir. 1997), where we held that charging prisoners fees for medical treatment was not prohibited by the Constitution, so long as they were provided with care even when they could not afford to pay the fees.

As in Reynolds, held the District Court, Tillman was never denied any basic human need. That a prisoner might leave jail with a debt was irrelevant. Disagreeing with the Magistrate Judge, the District Court also found it legally immaterial that a prisoner could forgo medicine but could not decline housing services.

Second, the Court rejected the "excessive fines" argument. Although the District Court doubted that the fees amounted to a "fine," it concluded that even if they were fines, they were not excessive because the costs of incarceration by definition cannot be disproportionate to the offense. Third, the due process claim was rejected because the notice given and postdeprivation remedy available through the grievance procedure were constitutionally adequate. Finally, the Court held that equal protection was not violated because trusty and work release inmates were taught financial responsibility, respectively, by being provided with labor opportunities and by being

6

required to make payments of at least $70.00 per week. The District Court therefore dismissed the case in its entirety. Tillman timely appealed.

The District Court properly exercised jurisdiction under 28 U.S.C. SS 1331, 1343(a)(3). Our jurisdiction is premised on 28 U.S.C. S 1291. We exercise plenary review, accepting the non-movant's allegations as true, and drawing inferences in the light most favorable to him. Meritcare Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 223 (3d Cir. 1999). The grant of summary judgment must be affirmed if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

II. Discussion

We initially note that a number of states authorize charges against a prisoner's wages or inmate account.2 Courts have consistently found that there is no constitutional impediment to deducting the cost of room and board from a prisoner's wages.3 In one case similar to the dispute before us, a state supreme court upheld daily

_____

2. Some statutes allow for deductions from a prisoner's wages. See, e.g., Ariz. Rev. Stat. Ann. S 41-1622, stat. note; Iowa Code Ann. S 904.701(2); Minn. Stat. Ann. S 243.23(2); Mo. Ann. Stat.S 217.435(2); Neb. Rev. Stat. Ann. S 83-184(b)(3). Other statutes provide for general authority to recover the cost of incarceration. See, e.g., Ark. Code Ann. S 12-29-501 et seq.; Fla. Stat. Ann. S 960.293(2); Iowa Code Ann. S 356.7(1); Mich. Comp. Laws Ann. S 800.404(8); Minn. Stat. Ann.S 243.23(3).

3. See, e.g., Christiansen v. Clarke, 147 F.3d 655, 657 (8th Cir. 1998); Mastrian v. Schoen, 725 F.2d 1164, 1166 (8th Cir. 1984); Iowa v. Love, 589 N.W.2d 49, 52 (Iowa 1998); Cumbey v. Oklahoma, 699 P.2d 1094, 1097 (Okla. 1985). Other courts have decided non-constitutional disputes arising under such statutes without noting any constitutional impediment to the statutes' application. See, e.g., Ford v. Arizona, 979 P.2d 10, 11, 13 (Ariz. Ct. App. 1999); Iowa v. Jackson, 601 N.W.2d 354, 356-57 (Iowa 1999); State Treasurer v. Gardner , 583 N.W.2d 687, 690 (Mich. 1998); cf. Auge v. New Jersey Dep't of Corrections, ___ A.2d ___, No. A-3472-98T1, 2000 WL 17309, *6 (N.J. Super. Ct. App. Div. Jan. 3, 2000) (ten percent surcharge on prisoner purchases would be acceptable on alternative ground of defraying "substantial costs" of food, clothing, medical care, and other necessities).

assessments of $50.00 that became, in effect, civil judgments against the prisoners. Ilkanic v. City of Fort Lauderdale, 705 So. 2d 1371, 1372-73 (Fla. 1998). Federal law acknowledges that a prisoner's wages might be subject to deductions for room and board. 18 U.S.C. S 1761(c)(2)(B). In addition, we have noted in dictum that "sparing the taxpayers the cost of imprisonment would likely be a constitutionally permissible governmental purpose." United States v. Spiropoulos, 976 F.2d 155, 168 (3d Cir. 1992).

In reviewing prison regulations, we ask whether the regulation is reasonably related to a legitimate penological interest. Turner v. Safley, 482 U.S. 78, 89 (1987).4 We share the Magistrate Judge's skepticism over whether the Turner standard is applicable to the Cost Recovery Program, which by its own title might be more properly understood as a transfer of funds than a way to regulate prison behavior. We need not determine whether Turner is controlling because in either case, no constitutional violation has occurred.

The complaint charged a violation of 42 U.S.C. S 1983 from the alleged "swindling [of] state prisoner[s]" under the Cost Recovery Program.5 The parties now focus on the

_____

4. Under Turner, we look to:

>      (1) the rational relationship between the regulati on and the
>      governmental interest put forward to justify it;

>      (2) the existence of alternative means to exercise  the asserted
> right;

>      (3) the impact on prison resources of accommodatin g the asserted
>      right; and

>      (4) the existence of "ready alternatives" to  accommodate the
>      asserted right at "de minimis" cost to valid penological interests

Reynolds v. Wagner, 128 F.3d 166, 172 (3d Cir. 1997).

5. The pro se complaint further alleges that the plaintiff was subjected to
false incarceration and that he was charged fees to see a doctor. The plaintiff notes that he has a separate pending action regarding any claim that he was held prisoner beyond his legal sentence. That claim is therefore not before us.

On appeal, the plaintiff -- apparently in the context of discussing the room and board fees -- makes a number of somewhat jumbled factual

Cruel and Unusual Punishments and Excessive Fines
Clauses of the Eighth Amendment, and the Due Process
and Equal Protection Clauses of the Fourteenth

Amendment. We will address these provisions in turn. 6

A. Eighth Amendment

1. Cruel and Unusual Punishments

The Cruel and Unusual Punishments Clause of the
Eighth Amendment7 proscribes"punishments which are
incompatible with the evolving standards of decency that
mark the progress of a maturing society." Estelle v. Gamble,
429 U.S. 97, 102 (1976) (internal quotes omitted).
Prohibited are punishments that "involve the unnecessary
and wanton infliction of pain, or are grossly

_____

allegations about medical care in the argument portion of his brief. He
admits that no such facts were put before the District Court due to the
"flaccidity" of counsel's brief. Opening Br. at 9. Further, counsel does
not
assert that these facts are specific to the plaintiff 's situation,
instead
appearing to relate to general matters that "[c]ounsel is told." Id.

The defendants properly complain that we should not consider these
facts, which are of dubious relevance to this appeal in any case.
Although we normally hold pro se complaints to a "less stringent"
standard than formal pleadings drafted by lawyers, Micklus v. Carlson,
632 F.2d 227, 236 (3d Cir. 1980), the plaintiff here has been represented
by counsel since the defendants filed their dispositive motions. The
plaintiff has not filed any affidavits, has not put forth cognizable
argument, and in this context, does not cite to relevant authority. The
plaintiff 's "passing reference in a brief will not suffice to bring that
issue
before this court." Simmons v. City of Philadelphia, 947 F.2d 1042, 1066
(3d Cir. 1991).

6. Although the pro se complaint did not identify any particular theory of
recovery, the Magistrate Judge gave it a generous reading and focused
his analysis on the Eighth and Fourteenth Amendments. The plaintiff,
through counsel, now points to those provisions in his statement of the
issues presented for review. Although we address those issues, we
decline to consider whether any other legal theory might provide for
recovery.

7. The Eighth Amendment states in full: "Excessive bail shall not be
required, nor excessive fines imposed, nor cruel and unusual
punishments inflicted."

disproportionate to the severity of the crime." Rhodes v. Chapman, 452 U.S. 337, 346 (1981) (citations and internal quotes omitted).

Prison conditions may amount to cruel and unusual punishment if they cause "unquestioned and serious deprivations of basic human needs . . . . [that] deprive inmates of the minimal civilized measure of life's necessities." Id. at 347. Accordingly, when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety. DeShaney v. Winnebago Co. Dep't of Social Svcs., 489 U.S. 189, 199-200 (1989).

To demonstrate a deprivation of his basic human needs, a plaintiff must show a sufficiently serious objective deprivation, and that a prison official subjectively acted with a sufficiently culpable state of mind, i.e., deliberate indifference. Nami v. Fauver, 82 F.3d 63, 67 (3d Cir. 1996) (citing Wilson v. Seiter, 501 U.S. 294 (1991)).

In City of Revere v. Massachusetts General Hospital, 463 U.S. 239 (1983), a hospital sued a city for the cost of treating a person shot by a police officer. The Court held that although the city was responsible for ensuring that medical care was provided, the Constitution did not dictate the allocation of costs between the city and the hospital. Id. at 245. In so holding, the Court noted that "[n]othing we say here affects any right a hospital or governmental entity may have to recover from a detainee the cost of the medical services provided to him." Id. at 245 n.7. The Court thus hinted that so long as treatment was provided, the cost of the services might be recovered from the detainee who received the benefit of the medical treatment.

We made a similar assumption in Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987), where female prisoners were required to obtain their own financing to obtain elective abortions. Looking to the deliberate indifference standard, we held that regardless of an inmate's inability to pay, the government was obliged to provide medical services for those inmates in its custody. Id. at 350. In so holding,

however, we held that the government's additional obligation to pay for these services was contingent upon a lack of "alternative methods of funding." Id. at 351. We thus assumed that where an inmate could secure her own funding, it would not be unreasonable to make her pay her way.

These cases demonstrate that both the Supreme Court and our Court anticipated cases where the state would be responsible for ensuring the provision of care, but might seek reimbursement from the party receiving the benefit of the care. We squarely faced that situation in Reynolds v. Wagner, 128 F.3d 166 (3d Cir. 1997), where prisoners were required to pay fees in order to obtain medical treatment. The program's purpose was to instill financial responsibility and to discourage abuse of sick call. Where a nurse or physician determined that sick call was warranted, however, the fee would be waived. Further, certain services, such as emergency care, psychiatric services, and other treatments were exempt from the fee requirement.

The facts of that case are strikingly similar to the appeal presently before us. In Reynolds, no inmate was refused treatment because of a lack of funds. Instead, the prisoner's account was debited, and if the available funds were insufficient, a negative balance would be created. Half of all incoming funds could be used to satisfy the negative balance. Upon departure from the facility, the unpaid debt could be turned over to a collection agency. If the inmate was recommitted, the debt remained in full force.

In that case, we rejected the argument that imposing a fee was per se unconstitutional. The plaintiffs were not denied medical care; further, "[i]f a prisoner is able to pay for medical care, requiring such payment is not deliberate indifference to serious medical needs." Id. at 174 (internal quotes eliminated). In the outside world, the plaintiffs would have to pay for medical care. Id. Further, the proffered purposes -- teaching fiscal responsibility and deterring sick-call abuse -- were obviously reasonably related to legitimate penological interests. Id. at 175.

In light of the caselaw, we conclude that Tillman has not shown that he has been subjected to cruel and unusual

11

punishment. Undisputed evidence shows that the Cost Recovery Program is intended to teach fiscal responsibility to inmates. The plaintiff, who has since been released, is now expected by society to pay his own room and board. Teaching him such a skill while in prison amply satisfies Turner's requirement that the program be reasonably related to a legitimate penological interest. Turner, 482 U.S. at 89; James v. Quinlan, 866 F.2d 627, 630 (3d Cir. 1989).

Regardless of Turner's applicability, we reach the same conclusion. Tillman's sentence was not extended, nor was he reincarcerated for failure to satisfy his debt. More importantly, he cannot show that basic human needs were left unsatisfied. He was never denied room, food, or other necessities, regardless of his failure to pay the fees. See Rhodes, 452 U.S. at 348 (double celling did not deprive prisoners of food, care, or sanitation, increase violence or create other intolerable conditions). This is simply not a case like Lanzaro, where necessary services were denied because a prisoner lacked the funds to pay.

We note that Reynolds also considered and rejected an "as implemented" challenge to the disputed medical fees. We concluded there that such a challenge must fail because, inter alia, the "inmates have not pointed out evidence showing that they need this money for any vital expenses." Reynolds, 128 F.3d at 177. The plaintiff 's argument here suffers from the same shortcoming. He complains in the abstract that prisoners need funds to pay for "essentials like toiletries, stamps, extra blankets[,] etc." He does not, however, identify how the program caused him to be denied his own "basic human needs." Cf. City of Revere, 463 U.S. at 245 (so long as the necessary services are provided, "the Constitution does not dictate" the allocation of costs).

Along these lines, we disagree with the Magistrate Judge that Reynolds is distinguishable because a prisoner might choose to forgo medical care, but cannot refuse to reside in an institution. The District Court correctly concluded that this distinction is without legal import. The fundamental question before us is whether basic human needs were denied to the plaintiff because of the defendants' deliberate indifference. In both Reynolds and the present case, the

12

defendants did not directly deny serious necessities to the prisoner plaintiffs; and in neither case did the plaintiffs present evidence to show that, due to the defendants' deliberate indifference, they were faced with a Hobson's choice between paying fees and purchasing necessities. Reynolds, 128 F.3d at 178.

We also reject the plaintiff 's complaint that he is now burdened with post-incarceration debt. A similar argument was presented in Reynolds, where we noted that "[t]here is, of course, no general constitutional right to [be] free" of "a personal expense that [the plaintiff] can meet and would be required to meet in the outside world." Id. at 173-74. If Tillman truly cannot meet his financial obligations, then his concerns would be more appropriately addressed in a federal bankruptcy court. That he is unhappy to be saddled with debt is understandable, but in the present circumstances, does not implicate the Cruel and Unusual Punishments Clause.8

2. Excessive Fines

By its plain language, the Excessive Fines Clause of the Eighth Amendment is violated only if the disputed fees are both "fines" and "excessive." See United States v. Bajakajian, 118 S. Ct. 2028, 2033, 2036 (1998). 9 We

---

8. The Magistrate Judge was concerned that the amount of debt accumulated raised a factual dispute as to whether a cruel and unusual punishment was shown. The only pertinent question in the present context, however, is whether the plaintiff 's basic human needs were met. Although a potentially insurmountable debt might implicate the Cruel and Unusual Punishments Clause in theory, we agree with the District Court that under these circumstances, the question of whether a debt is "grossly disproportionate to the severity of the crime," Estelle, 429 U.S. at 103 n.7, is a matter more appropriately considered within the auspices of the Excessive Fines Clause, as discussed in the next subsection.

9. The Excessive Fines Clause of the Eighth Amendment, once virtually ignored, has been "rescued from obscurity" in recent years. Department of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 803 n.2 (1994) (Scalia, J., dissenting). The text of the Eighth Amendment was directly based on Art. I, S 9 of the Virginia Declaration of Rights, which in turn

conclude that the Cost Recovery Program does not amount to an excessive fine.

The term "fine" refers to punishment for a criminal offense. Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265 (1989). The fees here, however, do not appear to fit that mold. A prisoner's term of incarceration cannot be extended, nor can he be reincarcerated, for failure to pay a negative balance. The daily fees do not vary with the gravity of the offense and can neither be increased nor waived. Rather than being used to punish, the undisputed evidence shows that the fees are designed to teach financial responsibility. More fundamentally, the fees can hardly be called fines when they merely represent partial reimbursement of the prisoner's daily cost of maintenance, something he or she would be expected to pay on the outside.10

The District Court passed on the "fines" issue because of an apparent nagging concern over whether the payments are "in part, punitive." If the assessments and confiscations under the Cost Recovery Program "can only be explained as serving in part to punish," they are "punishment" for purposes of the Excessive Fines Clause, even if they may

_____

was taken verbatim from the English Bill of Rights. Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 266 (1989) (quoting Solem v. Helm, 463 U.S. 277, 285 n.10 (1983)). The Eighth Amendment received scant debate in the First Congress, and the Excessive Fines Clause received none. Id. at 294 (O'Connor, J., concurring in part and dissenting in part). This is unsurprising because at least eight of the original States had a provision similar to the Excessive Fines Clause. Id. at 264 & n.5 (op. of the Court).

10. In his pro se complaint, Tillman alleges that the county prison is reimbursed by the state for his costs of room and board, thus suggesting that the prison profited from the fees that he was charged. The defendants subsequently asserted in an affidavit that the county prison is not reimbursed for a state prisoner such as the plaintiff, who was reincarcerated for parole violations. The plaintiff has not submitted an affidavit or other evidentiary material to dispute the defendants' affidavit
to the contrary. In this situation, an adverse party may not rest upon mere allegations in his pleadings, and any inconsistency does not give rise to a disputed question of material fact. Fed. R. Civ. P. 56(e).

14

also be understood to serve remedial purposes. Austin v. United States, 509 U.S. 602, 610, 620-21 (1993). The Court also correctly noted, however, that the undisputed record indicates that the program was imposed for rehabilitative and not punitive purposes.

We need not reach that issue. Even assuming that there is a factual question as to whether the Cost Recovery Program amounts to a fine, we hold that it is not excessive. Under the principle of "proportionality[, t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." Bajakajian, 118 S. Ct. at 2036. The plaintiff 's underlying offenses included a conviction for possession with intent to deliver approximately 29 grams of cocaine in violation of 35 P.S. S 780-113(a)(30), which allows for a fine not to exceed $100,000.00. Id. S 780-113(f)(1.1).

Here, the plaintiff accumulated debt of roughly $4,000.00. It can hardly be said that a sum that is less than one-twentieth the legally permissible fine is"grossly disproportional to the gravity of a defendant's offense." Bajakajian, 118 S. Ct. at 2036; see also Yskamp v. Drug Enforcement Admin., 163 F.3d 767, 773 (3d Cir. 1998) (forfeiture of property valued at over $500,000.00 in drug case not excessive). We will not speculate on the result we would reach where the offense was significantly less serious, or where the daily fees or total debt were significantly higher. Cf. Ilkanic, 705 So. 2d at 1372-73 (rejecting due process and equal protection challenges to statute that provided for assessment of $50.00 per day for "damages and losses for incarceration costs and other correctional costs"). Under the circumstances presently before us, however, we conclude as a matter of law that the amounts were not "excessive" under the Eighth Amendment.

B. Fourteenth Amendment

1. Due Process

Under procedural due process, the plaintiff 's interest must fall within the scope of "life, liberty, or property." Hewitt v. Helms, 459 U.S. 460, 466 (1983). The defendants

15

properly concede that the plaintiff has a property interest in his prison account, Reynolds, 128 F.3d at 179, but insist that he was provided with adequate procedural due process. We agree.

In considering a due process claim, we look to the private interest, the governmental interest, and the value of the available procedure in safeguarding against an erroneous deprivation. Id.; see also Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Due process " `is flexible and calls for such procedural protections as the particular situation demands' " in order to "minimiz[e] the risk of error." Greenholtz v. Inmates of the Nebraska Penal and Corr. Complex, 442 U.S. 1, 12–13 (1979) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "The amount of notice due depends on the context." Reynolds, 128 F.3d at 179 (citing Gilbert v. Homar, 117 S. Ct. 1807, 1812 (1997)).

In some cases, takings of property by the State require predeprivation notice and a hearing. Parratt v. Taylor, 451 U.S. 527, 538 (1981), overruled on other gds. , Daniels v. Williams, 474 U.S. 327 (1986).11 But where the State must take quick action, or where it is impractical to provide meaningful predeprivation process, due process will be satisfied by a meaningful postdeprivation remedy. Id. at 539. "In such cases, the normal predeprivation notice and opportunity to be heard is pretermitted if the State provides a postdeprivation remedy." Id. at 538."Parratt is not an exception to the Mathews balancing test, but rather an application of that test to the unusual case in which one of the variables in the Mathews equation –– the value of predeprivation safeguards –– is negligible in preventing the kind of deprivation at issue." Zinermon v. Burch, 494 U.S. 113, 129 (1990).12

_____

11. Daniels overruled Parratt only to the extent that the earlier case held
that a mere lack of due care may deprive an individual of "life, liberty, or property under the Fourteenth Amendment." Daniels, 474 U.S. at 330–31.

12. We recognize that some cases hold that Parratt does not apply where an " `established state procedure' " destroys an entitlement without proper procedural safeguards. See, e.g. , Logan v. Zimmerman Brush Co., 455 U.S. 422, 436 (1982) (quoting Parratt, 451 U.S. at 541); Brown v.

It is impractical to expect the prison to provide
predeprivation proceedings under these circumstances. As
the takings and assessments pass substantive
constitutional muster,13 we only need ask whether the
attendant procedure is also constitutionally adequate. It is.
The assessments and takings pursuant to the program
involve routine matters of accounting, with a low risk of

_____

Trench, 787 F.2d 167, 171 (3d Cir. 1986). In such a case, a
predeprivation hearing is still required. Brown , 787 F.2d at 171.
However, the Supreme Court has since noted in an ex parte forfeiture
case, i.e., one that involves established state procedures, that in
"extraordinary situations," predeprivation notice and hearings are
unnecessary. United States v. James Daniel Good Real Property, 510 U.S.
43, 53 (1993). The case before us presents such an"extraordinary
situation." As we held in Reynolds, "a prison must have the ability to
deduct fees from an inmate's account even when the inmate refuses to
grant authorization." Reynolds, 128 F.3d at 180. Thus, if the available
postdeprivation procedure is adequate, then that is all the process to
which the plaintiff is due under these circumstances.

13. As noted in the previous section, the Cost Recovery Program does not
violate the Eighth Amendment. Also, we do not see a substantive due
process violation. Substantive due process rights"are at least as great as
the Eighth Amendment protections available to a convicted prisoner."
City of Revere, 463 U.S. at 244. We need only note that we have
considered and rejected the plaintiff 's Eighth Amendment arguments.
Further, we considered a substantive due process claim arising under
almost identical circumstances in Reynolds, 128 F.3d at 182, and see no
need to find differently here.

We acknowledge that in United States v. Spiropoulos, 976 F.2d 155 (3d
Cir. 1992), we held that former U.S.S.G. S 5E1.2(i) violated the Due
Process Clause of the Fifth Amendment. Id. at 169. That Guideline
required sentencing judges to order defendants to pay the costs of their
imprisonment. Our decision in Spiropoulos, however, was premised on a
lack of authority in the Sentencing Reform Act to assess fines to recoup
the costs of incarceration. Id. at 165. Further, the funds collected under
U.S.S.G. S 5E1.2(i) were not put towards prison costs, but instead placed
into the Crime Victims Fund. The present case differs materially from
Spiropoulos. Authorization for the Cost Recovery Program was specifically
granted by the Lebanon County Prison Board. In addition, any funds
raised under the Cost Recovery Program are put into the county's
general fund, which in turn finances the county prison. In sum, any
substantive theories proffered by the plaintiff fail.

17

error. To the extent that mistakes such as erroneous assessments or incorrect takings might occur, they may be corrected through the prison's grievance program without any undue burden on a prisoners' rights. On the other hand, to require predeprivation proceedings for what are essentially ministerial matters would significantly increase transaction costs and essentially frustrate an important purpose of the program, which is to reduce the county's costs of incarcerating prisoners.

The plaintiff had adequate notice of the grievance program and of the Cost Recovery Program. Upon confinement in January of 1997, notice of the Cost Recovery Program and a copy of it were still posted in the plaintiff 's cell block. Also, Tillman was given a handbook, which described the prison grievance procedure. When the handbook was updated to include the Cost Recovery Program and an expanded grievance procedure, the plaintiff was given a copy of that as well. He was given an additional copy of the handbook upon reconfinement in October of 1997. The grievance program allowed prisoners to complain about "any" matter that is "unjust," and as updated, also provided for direct appeal to the warden.

In sum, the plaintiff had an adequate postdeprivation remedy in the grievance program. In Reynolds, we held that the existence of a similar grievance program provided a sufficient remedy. 128 F.3d at 181. In sum, the plaintiff had an adequate postdeprivation remedy, thereby satisfying due process.14

We also note that there is no due process violation in the fact that the plaintiff 's account was turned over for collection. He could have avoided this turn of events by making payments as low as $5.00 a week on his debt.

_____

14. The plaintiff does not argue that advance notice of the program was required. In any case, because an adequate postdeprivation remedy exists, no advance notice was necessary. Even if advance notice were necessary, it was satisfied under the facts of this case. The plaintiff 's property right in his inmate account did not vest until he was incarcerated for parole violations. At that time, he was given notice of the
existence of the program and the grievance procedure. Due process does not require more.

The plaintiff also complains that the prison lacked authority to implement the Cost Recovery Program, but we find no problem in that arena as well. Although we have not uncovered a statute explicitly providing for the deductions at issue here, the Cost Recovery Program was duly promulgated, not by the state, but by the county prison board, which has "exclusive[ ]" authority regarding "the government and management" of the facility. 61 P.S. S 408(a)(1).15 Other courts have not seen barriers to the

_____

15. Because Lebanon County is a county of thefifth class, its prison board is "exclusively vested" with "the safe-keeping, discipline, and employment of prisoners, and the government and management of said institution." 61 P.S. S 408(a)(1). The board "shall make such rules and regulations . . . as may be deemed necessary." Id. S 409. Thus, the prison board indeed has the authority to promulgate the Cost Recovery Program.

Our conclusion is unchanged by 61 P.S. S 410, which states that "all the expenditures required for the support and maintenance of prisoners, the repairs and improvement of said prison, shall be paid from the county treasury by warrants drawn, in the mode now prescribed by law, on the regular appropriation for the purpose." Wefirst note that any funds obtained through the Cost Recovery Program are placed into the county's general fund, out of which all prison expenses -- including prisoner maintenance -- are duly paid in accordance with section 410. Thus, the Cost Recovery Program is not in violation of this statute.

But we need not rest our conclusion on the mere mechanics of accounting. Reading section 410 as a whole makes it clear that its focus is on the proper procedures for payments, accounting, and contracting. See id. ("no warrant shall be certified by the controller for any expense connected with the prison unless on vouchers approved by a majority of said board and endorsed by the president and secretary thereof, and all contracts involving an expenditure of funds from the county treasury shall be made in accordance with [the law]").

More fundamentally, section 410 is utterly silent regarding the permissible sources of funds that go into the treasury. We do not read this silence to support the plaintiff 's argument. Rather, section 410 simply requires that creditors be paid in the first instance by the county.
In no way does it prohibit the recovery of costs from those who receive the benefits of those expenditures. To conclude otherwise would be contrary to Reynolds, where we upheld similar prisoner assessments. In sum, because sections 408 and 409 expressly grant broad and exclusive authority to the prison board, we reject the plaintiff 's suggestion that the board lacked the authority to promulgate the Cost Recovery Program.

19

promulgation of such programs by prisons and prison officials, and neither do we. See Reynolds, 128 F.3d at 170, 183 (upholding program that was created by county prison); Mastrian, 725 F.2d at 1165-66 (upholding programs instituted by correctional officials).

2. Equal Protection

Nor do the facts show a violation of the Equal Protection Clause. Under that provision, persons who are similarly situated should be treated in the same manner. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). Because the distinctions at issue here do not implicate a suspect or quasi-suspect class, the state action here is presumed to be valid and will be upheld if it is "rationally related to a legitimate state interest." Id. at 440-42. The defendants maintain that the program is designed to teach fiscal responsibility to inmates. Another conceivable purpose is to reimburse the state for the expenses of incarceration. Malmed v. Thornburgh , 621 F.2d 565, 569 (3d Cir. 1980) (state action may be upheld on any valid ground, even one hypothetically posed by the court).

Both interests are legitimate and the plaintiff does not present an argument to the contrary. Further, the purposes of teaching fiscal responsibility and partially recouping the costs of incarceration are surely rationally related to requiring inmates to pay for their share of maintenance. The plaintiff would have to make similar expenditures on the outside, and making him do so under the Cost Recovery Program teaches him to assume real-world responsibilities.

We also note that although "trusty" inmates are not charged for room and board, they "pay" their housing costs by providing labor to the prison. Similarly, work release inmates pay at least $70.00 per week to the prison, and therefore do not pay any less than those prisoners in the Cost Recovery Program. Where there is no discrimination, there is no equal protection violation. Mastrian , 725 F.2d at 1166.

The plaintiff also complains that inmate Anthony Ashford was not charged any fees. Undisputed evidence shows that Ashford had been removed from the Work Release Program,

20

and prison authorities mistakenly failed to begin charging him fees under the Cost Recovery Program. Upon being alerted to this oversight, Ashford's account was back-charged for all the relevant fees. As such, the plaintiff cannot point to any discrimination, and therefore to any equal protection violation.

III. Conclusion

The judgment of the District Court will be affirmed.

21

RENDELL, Circuit Judge, concurring in part and dissenting in part:

In his pro se complaint, Tillman, a state prisoner, alleges that the Lebanon County prison took half of the money in his wallet, as well as half of the money orders sent to him, to pay the balance of a daily $10 charge incurred during an earlier prison sentence. The prison took this money pursuant to a policy adopted by the Lebanon County Prison Board. Tillman states, "I sign [sic] no agreement or contracts to have them take my money." His counseled brief on appeal similarly attacks the prison's basis for taking his money, stating that "no court, nor any statute, authorizes the imposition of the arbitrary costs forced on appellant against his will." Brief for Appellant at 6. According to the affidavit of the former Chairman of the Lebanon County Prison Board, the Prison Board adopted the Cost Recovery Program "as a rehabilitative measure, designed to teach sentenced inmates financial responsibility, by requiring them to contribute to the expenses necessary to house, feed, clothe and protect them while incarcerated." App. 92.

The majority concludes that the prison's internal grievance procedure provides prisoners with the post-deprivation opportunity for a hearing that due process requires. I agree with the majority's holding, as far as it goes. However, I do not think we have addressed the more fundamental substantive due process question raised by Tillman's allegations, namely, what enables the Lebanon County Prison Board to impose this consequence upon a person convicted of a state crime? Can it, on its own, decide to deprive state prisoners unfortunate enough to be housed there of $10 per day, to be paid to the county's coffers, under the guise of rehabilitating them and teaching them financial responsibility? Although the imposition of this compensation scheme is obviously not the same as restitution, it strikes me as a similar type of sentencing consequence that should emanate from the state in the first instance.1

_____

1. In Pennsylvania, "an order of restitution must be based on statutory authority." In the Interest of M.W., 725 A.2d 729, 731 (Pa. 1999) (citing

22

As the majority notes, other states have passed legislation authorizing prisons to take inmates' funds in situations such as this. Interestingly, the Pennsylvania legislature has chosen to authorize county prisons to collect a reasonable amount from prisoners, but the statute applies only to those incarcerated "on weekends or other short periods each week."[2] I submit that the record and briefs do not explore this issue adequately. I suggest, further, that the majority's reasoning, contained in a footnote, that a state law establishing boards of inspectors to oversee prison operations provides the requisite authority to impose this charge as a consequence of incarceration is less than persuasive. I also do not believe that the case law cited by the majority provides a satisfactory paradigm for this type of mandatory charge.[3]

_____

Commonwealth v. Harner, 617 A.2d 702, 704 (Pa. 1992) ("It is generally agreed that restitution is a creature of statute and, without express legislative direction, a court is powerless to direct a defendant to make restitution as part of a sentence.")). In the federal context, we recently reiterated the "firmly established principle that federal courts may not order restitution in the absence of statutory authorization." United States v. Akande, 200 F.3d 136, 138 (3d Cir. 1999). If the rehabilitative measure Tillman challenges is not a punitive one, what is its precise character?

2. Section 2146, "Collection from weekend prisoners," provides as follows:

> The county prison board, or where applicable the county commissioners, may, by resolution which shall establish rates and qualifications, authorize the warden, sheriff or other person in charge of the jail to collect a reasonable amount from prisoners incarcerated only on weekends or other short periods each week.

Pa. Stat. Ann. tit. 61 S 2146 (West 1999). See Commonwealth v. Cassell, 12 Pa. D. & C. 4th 265 (York County 1991) (concluding that section 2146 authorized short-term fee to be imposed upon defendant, who had requested deferment of mandatory minimum 48-hour prison sentence).

3. The precise question at issue in this appeal was raised in neither Reynolds v. Wagner, 128 F.3d 166 (3d Cir. 1997), nor Mastrian v. Schoen, 725 F.2d 1164 (8th Cir. 1984) (affirming grant of summary judgment in favor of state correction officials on a complaint alleging an

23

Tillman has presented a fundamental question, and I
would reverse and remand for further development of this
issue.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

equal protection violation stemming from a now-discontinued
experimental program to charge room and board based on inmates'
levels of income in a state prison). In Reynolds , we characterized the
fee
at issue as to be paid in consideration for beneficial medical services,
Reynolds, 128 F.3d at 180, and it is clear from the exceptions to the fee
requirement (e.g., initial intake, emergency, psychiatric services,
chronic
illness screening) that choice was involved to avail oneself of medical
services for which a fee was charged, which is not the case here.

24