*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0361p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

CALVIN SICKLES et al.,

        *Plaintiffs-Appellants,*

        *v.*

CAMPBELL COUNTY, KENTUCKY; KENTON COUNTY, KENTUCKY,

        *Defendants-Appellees.*

No. 06-6055

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
Nos. 05-00096; 05-00102; 05-00110—
William O. Bertelsman, District Judge.

Argued: July 17, 2007

Decided and Filed: September 5, 2007

Before: GIBBONS and SUTTON, Circuit Judges; BECKWITH, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** Stephen R. Felson, NEWMAN & MEEKS CO., LPA, Cincinnati, Ohio, for Appellants. Jason V. Reed, EDMONDSON, GUENTHER & RYLEE, Covington, Kentucky, Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, Covington, Kentucky, for Appellees. **ON BRIEF:** Stephen R. Felson, Robert B. Newman, NEWMAN & MEEKS CO., LPA, Cincinnati, Ohio, for Appellants. Jason V. Reed, EDMONDSON, GUENTHER & RYLEE, Covington, Kentucky, Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, Covington, Kentucky, for Appellees.

---

## OPINION

---

    SUTTON, Circuit Judge. May a municipal jail, consistent with the Due Process Clause of the Fourteenth Amendment, withhold a portion of an inmate's canteen-account funds in order to cover the costs of booking, room and board without providing the inmate with a hearing before it

---

    [*] The Honorable Sandra S. Beckwith, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

withholds the money? Yes, we hold, and accordingly we affirm the district court's rejection of this claim and two others.

I.

The municipal jails in Campbell County and Kenton County, Kentucky, require individuals who are arrested and jailed to surrender any property found on them. To ensure the return of these possessions, a municipal officer logs any property surrendered to the jail upon intake and places the items in storage. The counties treat cash differently. Each county deposits any cash into the inmate's canteen account, an account that the inmate may use to purchase goods from the commissary while in jail.

Friends and relatives also may contribute to an inmate's canteen account. In Kenton County, the jail will accept a money order, which the jail credits to the inmate's canteen account. In Campbell County, the municipal jail does the same, though it permits inmates to decline the money order; in addition, it permits a donor to charge a gift to his credit card through a third-party company, which then forwards the funds to the county jail. In both counties, a computer program tracks the funds deposited in each inmate's account.

Neither county grants inmates instant access to all funds deposited in their accounts. When Campbell County incarcerates an individual, it automatically withholds a fee—once $20, now $30—from the inmate's canteen account to cover the costs of booking and arraignment. *See* Ky. Rev. Stat. § 441.265(6). Both counties assess inmates a room-and-board fee—$20 a day in Campbell County, $5 a day in Kenton County—for each night they spend in the county jail. Campbell County withholds up to one quarter of any monetary gifts to the inmate to cover these fees as well as up to a quarter of any funds remaining in an inmate's canteen account at the end of each day. Kenton County recovers per diem fees by withholding up to one half of any funds given to an inmate as well as up to one half of any funds remaining in an inmate's canteen account at the end of the week. Kenton County does not charge inmates with a booking fee ($30) until it releases them.

In 2003, the Kenton County jail housed Aretta Baughn's son. Because she knew about the county's canteen-account policies, the first time she sent her son a gift she made the money order out to a state inmate incarcerated with her son to avoid any withholding of funds. *See* Ky. Rev. Stat. § 441.265(8) ("No per diem shall be charged to any prisoner . . . that the Department of Corrections is financially responsible for housing."). She later directly sent to her son six additional money orders ranging from $10 to $100 in amount.

In January 2005, Campbell County officers arrested Aisha Abdulrahim's husband and held him in the municipal jail. She has sent him three money orders a month since then, and county officials have "confiscate[d] not less than 25% of the amount transmitted to her husband" each time. JA 36.

In early 2005, Campbell County held Cheryl Lightfoot's son in its municipal jail. While her son was there, Lightfoot sent him at least three money orders of $40 each, as well as several others in smaller amounts. She "tried to keep it at least 40 each time, because [she] knew [the county] would take a certain amount out" each time. JA 133.

On March 5, 2005, Campbell County officers arrested Calvin Sickles for public intoxication and disorderly conduct. Sickles was carrying $128 in cash at the time, so Campbell County credited that amount to his canteen account less a $20 booking fee. On March 7, Sickles pleaded guilty to both charges. The state court sentenced him to two years of conditional discharge and ordered him to "[p]ay the cost of proceeding herein." Doc. 24, Ex. 2. When Sickles was discharged on March 16, Campbell County withheld his $20 booking fee.

On April 7, 2005, Campbell County officers arrested Chad Hensley for criminal possession of a forged prescription. Over the course of the next six weeks, a relative delivered nine money orders to the municipal jail, totaling $320. Hensley endorsed each of these money orders, knowing that the county would withhold part of each deposit to cover per-diem and booking fees. By the time Hensley was released on bond on May 27, he had accrued $1,032 in fees, and the county had withheld $110.27 to offset the fees.

On May 17, 2005, Sickles filed this § 1983 action in federal court, seeking (1) a declaration that Campbell County's deduction policy violated the Due Process Clause and (2) damages. On May 31, Lightfoot, Abdulrahim and Hensley filed a similar § 1983 action against Campbell County, and, on June 7, Baughn filed a similar § 1983 action against Kenton County. The district court consolidated all three matters. After hearing cross-motions on the issue, the district court granted summary judgment to the counties on all claims.

II.

A.

Sickles and Hensley challenge Campbell County's withholding policy. In doing so, they do not contend that the Federal Constitution prohibits the county from requiring inmates to share some of the costs of incarceration; they instead argue that the policy violates the Due Process Clause because the county takes the funds from the inmate's account without a predeprivation hearing. We disagree.

This challenge, like most procedural due process claims, raises two questions: Do the claimants have a liberty or property interest that the county policy affects? And, if so, what process is due? *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). The inquiries are "flexible" and contextual in nature, "call[ing] for such procedural protections as the particular situation demands." *Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 12–13 (1979). As to the first question, Sickles and Hensley both have a property stake in the application of the procedures—Sickles in the money withheld from him upon his arrival at the jail and Hensley in the money given to him and withheld by the county.

In addressing what process is due, we balance "[1] the private interest that will be affected by the official action; . . . [2] the risk of an erroneous deprivation[;] . . . [3] the probable value, if any, of additional or substitute procedural safeguards; and . . . [4] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Id.* at 348.

Gauged by these four factors, this claim falls short. *First*, the "private interest[s]" at issue are small in absolute and relative terms, totaling $20 in Sickles' case and $110.27 in Hensley's. The private stakes at issue thus do not begin to approach the kinds of government conduct that have required a predeprivation hearing, such as a limitation on the "historic" "right to maintain control over [one's] home," *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53–54 (1993), or the termination of government benefits, which for many people are "the very means by which to live," *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970).

*Second*, the risk of erroneous deprivation is minor. The withholding of funds involves elementary accounting that has little risk of error and is non-discretionary. One officer logs in all deposits to an inmate's account; another logs in all purchases from the commissary; and the computer calculates on a regular basis what funds, if any, need to be withheld from the inmate's account to cover booking and room-and-board fees. *See Slade v. Hampton Roads Reg'l Jail*, 407

F.3d 243, 253–54 (4th Cir. 2005) ("The daily deduction of the charge from the prisoner's account is a ministerial matter with no discretion and minimal risk of error."); *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 422 (3d Cir. 2000) ("The assessments . . . involve routine matters of accounting, with low risk of error."); *see also Taylor v. Sebelius*, 189 F. App'x 752, 761 (10th Cir. July 21, 2006) (noting a low risk of erroneous deprivation when "the collection of supervision fees is totally automated and is controlled by a comprehensive computer program").

*Third*, for many of the same reasons that the withholding poses little risk of error, the potential benefits of other safeguards—including a pre-deprivation hearing—are few. Errors, to be sure, may arise in any human enterprise, even one involving computers, but the simplicity of the calculations and the lack of discretion in making the withholdings renders improbable the possibility of arbitrary or otherwise improper government action. The program also contains other protections. Not only do inmates like Sickles and Hensley know about the program, particularly after the county removes money from their canteen accounts, but the county also provides notice to all inmates of the jail's internal grievance procedures, *see* JA 186 ("There are copies of inmate rules and rights in every cell and in the booking area . . . .").

Notably, neither Sickles nor Hensley challenged the withholding policy through those grievance procedures, and neither one explains why the grievance and other postdeprivation procedures fail to protect their interests in preventing a flawed withholding. *See Bailey v. Carter*, 15 F. App'x 245, 251 (6th Cir. July 20, 2001); *cf. Zinermon v. Burch*, 494 U.S. 113, 132 (1990) ("[I]n situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake . . . postdeprivation remedies might satisfy due process."); *Parratt v. Taylor*, 451 U.S. 527, 538–39 (1981). It is not even clear what the inmates hope to accomplish with a predeprivation hearing. They do not argue that they would fall under the "good cause" exception to withholdings, Ky. Rev. Stat. § 441.265(1), which applies when an inmate has shown "good cause . . . as to why [he] was unable to reimburse the detention center," *Lewis v. Commonwealth*, No. 2006-CA-000996-MR, 2007 WL 1575359, at *2 (Ky. Ct. App. June 1, 2007). And they do not explain when this hearing is necessary and what interests it would protect. To the extent they want the jail to wait until after a *sentencing hearing* to withhold these fees, they are barking up the wrong tree. That is not a request to establish a predeprivation hearing before the withholding but a request to delay the withholding.

*Fourth*, the government's interests—sharing the costs of incarceration and furthering offender accountability—are substantial, and indeed plaintiffs do not challenge them. The form of property at issue—funds deposited in an inmate's canteen account—justifies the government's interest in promptly collecting fees owed to it. Just as personal property "could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given," *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974), so inmates could drain their canteen accounts of funds prior to a hearing, a strategy some Campbell County inmates previously used to limit the funds available for withholding.

In view of the modest private interests at stake, the small risk of error, the limited benefits of additional safeguards and the unchallenged government interests in the policy, we see no need to "constitutionaliz[e] . . . [these] government procedures" and to impose the "additional cost in terms of money and administrative burden" that such a predeprivation procedure would require. *Mathews*, 424 U.S. at 347; *see also Taylor*, 189 F. App'x at 760–61; *Slade*, 407 F.3d at 253–54; *Tillman*, 221 F.3d at 421–22. As the Third Circuit has pointed out in a similar case: "[T]o require pre-deprivation proceedings for what are essentially ministerial matters would significantly increase transaction costs and essentially frustrate an important purpose of the program, which is to reduce the [county jail's] costs of incarcerating prisoners." *Tillman*, 221 F.3d at 422.

In resisting this conclusion, Sickles and Hensley argue that Kentucky law is inconsistent with Campbell County's withholding policy. *See* Ky. Rev. Stat. § 441.265. The statute, they note, says that a "sentencing court" shall require a "prisoner in county jail . . . to reimburse the county for expenses incurred by reason of the prisoner's confinement . . . except for good cause shown." *Id.* § 441.265(1). But to say that a sentencing court must do one thing (requiring reimbursement even after the inmate's release) is not to say that another government entity (the county jail) may not do another (collecting room-and-board fees from inmates while they remain in jail). *See State of Ill., Dep't of Pub. Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983) ("Not every silence is pregnant . . . ."). Plaintiffs, more to the point, premised their claim on a violation of the Federal Constitution, not state law. Although the Fourteenth Amendment requires a State to provide a fundamentally fair process "at a meaningful time and in a meaningful manner," *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965), it is not violated every time a county violates a state law—particularly a state law that does not purport to define a property interest or a pertinent liberty interest, *see, e.g.*, *Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992) (Section 1983 "does not provide a remedy for abuses [of state power] that do not violate federal law.").

Sickles and Hensley argue that more than a simple accounting is involved because the Kentucky statute grants inmates an "affirmative defense" to payment—financial incapacity. An inmate, true enough, may face reduced fees "based upon the ability of the prisoner . . . to pay." Ky. Rev. Stat. § 441.265(2)(b). But the statute does not pursue this goal by creating an affirmative defense; it directs the "jailer" to adopt "a prisoner fee and expense reimbursement policy," *id.* § 441.265(2)(a), whose rates "*may* be adjusted *in accordance with the fee and expense reimbursement policy* based upon the ability of the prisoner . . . to pay," *id.* § 441.265(2)(b) (emphasis added). While the statute permits Campbell County to adjust its fees for each inmate on the basis of financial capacity, it need not do so—and it did not do so here. It thus remains the case that Campbell County's adopted policy requires nothing more than grade-school arithmetic, leaving little risk of mistake.

Sickles and Hensley also complain that Campbell County's withholding policy prejudices "those arrested, booked and immediately released because of mistake." Br. at 29. But that issue is not presented on this record. Having already pleaded guilty, and having already been sentenced to "[p]ay the costs of proceeding herein," Doc. 24, Ex. 2, Sickles has no stake in this claim—and therefore no standing to bring it. Any like claim that Hensley might have is unripe. At the time of the complaint, he had been released on bond and thus did not face the prospect of any additional withholdings. Only if he is acquitted and only if the county retains the previously withheld funds would his claim ripen into a live dispute. Because the first contingency has not happened and because he points to no evidence that the county would retain the withheld funds if he is acquitted, Hensley asks for nothing more than advisory relief. Consistent with the Constitution's limitation on resolving "cases" and "controversies," we save the resolution of this "premature" dispute for another day when the risks of "entangling" ourselves "in abstract disagreements over administrative policies" are less acute and when "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967); *see Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003).

B.

Several non-inmates raise separate claims. Lightfoot, Abdulrahim and Baughn, who have sent money orders to their relatives in jail, claim that the counties' practice of withholding a portion of donated funds violates the *donor*'s due process rights. The problem with this claim is that the Fourteenth Amendment does not mandate "due process" for any and all interests and any and all things but only for "life," "liberty" and, as relevant here, "property." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("The procedural component of the Due Process Clause does not protect everything that might be described as a benefit: . . . [A person] must, instead, have a

legitimate claim of entitlement to it.") (internal quotation marks omitted). To establish a cognizable claim, these individuals thus must establish a protected property interest, an interest "defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

While these individuals undoubtedly once had an interest in this money, they voluntarily relinquished that interest when they gave it to their inmate relatives. Lightfoot, Abdulrahim and Baughn were competent donors; each of them intended to give away the funds in question, and none of them expected the money would be returned after she sent it. *See, e.g.*, JA 170 (Baughn recognizing that "[i]t was gone money"). The receipt and cashing of the money orders also satisfied the last three requirements of Kentucky's definition of a gift: Each inmate could accept money through a deposit to his canteen account; the county jails "deliver[ed]" the funds into those accounts; and each donation became complete upon deposit. *See Howell v. Herald*, 197 S.W.3d 505, 507 (Ky. 2006); *Gernert v. Liberty Nat'l Bank & Trust Co. of Louisville*, 145 S.W.2d 522, 525 (Ky. 1940).

*Gernert*, contrary to plaintiffs' suggestion, does not say otherwise. There, the court said that delivery of a gift to an agent (think of the prison) is sufficient as to both the agent and the principal donee (think of the inmate) if the donor "delivered [the property] to [the agent] with the distinct agreement that he shall distribute certain portions of it to others and shall retain a portion for himself." *Id.* Here the money *did* go to the inmates through the prison officials in connection with an understanding under the counties' policy that a portion would be withheld. No less importantly, the "decisive factor in determining whether a gift has been adequately delivered," Kentucky law makes clear, "is whether the putative donor has the power to reclaim the property," *Bryant v. Bryant*, No. 2002-CA-001149-MR, 2003 WL 22927757, at *2 (Ky. Ct. App. Dec. 12, 2003) (internal quotation marks omitted), and none of the three expressed any expectation that she could reclaim the money orders after she sent them.

In maintaining that the inmates could not accept the donated funds because both counties withhold a portion of them "before the donee-prisoner has any control over or opportunity to use the money," Br. at 16, they expect too much of the capacity-to-receive requirement. All that it demands is that the "person [be] capable of holding title to property," 38 Am. Jur. 2d Gifts § 15; *see Howell*, 197 S.W.3d at 508, which was assuredly true here. The recipient inmates also benefitted from the donated funds—not only because they could spend some of the funds for private purposes but also because the withheld funds defrayed each inmate's accrued debts—so there is little reason to doubt their capacity to accept, and their interest in accepting, the gifts. In point of fact, the Campbell County jail required all inmates to do that very thing when it asked them to endorse each money order.

## C.

Lightfoot, Abdulrahim and Baughn also contend that the counties' canteen-accounting policies violate their First (and Fourteenth) Amendment rights by curbing their free-speech right to send money to inmates. Br. at 18–21. As they see it, a "check ha[s] communicative value" because "money sent to a prisoner helps that prisoner make calls to the outside world." Br. at 19. Yes, a family member's monetary gift would make the inmate's subsequent phone calls "free speech," if that is how he chose to spend the money, but that is not exactly what the framers had in mind when they said that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend I. The amendment does not protect any conduct that at some point might have a connection to speech—which is why an increase in taxes does not violate the First Amendment even though taxpayers claim that the new taxes will limit their ability to engage in communicative activities and why the same would be true if the government lowered the exemption on taxable gifts even if the donor and donee had exhalted communicative plans for the money. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of

conduct can be labeled 'speech' . . . ."). No evidence, at any rate, suggests that the donors perceived these gifts as communicative and plenty of evidence suggests that these gifts had no more communicative value than an allowance provided once a week to a child by his parents. *See, e.g.*, JA 134 (Lightfoot, stating that she expected her son to buy "T shirts [and] socks" with the donated funds).

Donations to political candidates and campaigns, we appreciate, receive First Amendment protection. *See Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 127 S. Ct. 2652, 2676 (2007) ("[C]ontributing money to, and spending money on behalf of, political candidates implicates core First Amendment protections . . . ."); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387–88 (2000); *Buckley v. Valeo*, 424 U.S. 1, 16–17 (1976) (per curiam). But the reason for that rule in this setting and others—the "governmental interest in regulating [political contributions] arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful," *O'Brien*, 391 U.S. at 382—has no place here. From all that the record shows, the counties could care less what the inmates do with the money; they just want a reasonable way to pay for the costs of incarceration. One cannot give to a political campaign without expressing a political view; yet one can assuredly give money to an incarcerated inmate without expressing a political view and without expressing anything more than familial support. In the final analysis, even the most firm, muscular and "historic presumption in favor of First Amendment values," *Branzburg v. Hayes*, 408 U.S. 665, 736 n.19 (1972), does not advance this claim, which, if accepted, would do more to trivialize, than to promote, our time-honored First Amendment traditions.

III.

For these reasons, we affirm.