PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 13-1380 and 13-1478

_____

DOMINGO COLON MONTANEZ;
TIMOTHY A. HALE

v.

SECRETARY PENNSYLVANIA DEPARTMENT
OF CORRECTIONS; SCI ROCKVIEW INMATE
ACCOUNTING OFFICE; SUPERINTENDENT F. J.
TENNIS; FRANCIS M. DOUGHERTY;
EARL E. WALKER; RAYMOND CINGEL;
PENNSYLVANIA DOC; MICHAEL OPPMAN;
DIAN DETWILER; HARRY E. WILSON

Domingo Colon Montanez,
                    Appellant in 13-1380

Timothy Hale,
                    Appellant in 13-1478

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No. 4-04-cv-02569)
District Judge:  Honorable A. Richard Caputo

_____

Argued on November 7, 2013

Before: GREENAWAY, JR., VANASKIE and
ROTH, Circuit Judges

(Opinion filed: August 15, 2014)

Ernest D. Preate, Jr., Esquire **(Argued)**
Andrew M. Milz, Esquire
400 Spruce Street
Suite 300
Mellon Bank Building
Scranton, PA 18503

      Counsel for Appellant Domingo Colon Montanez

Su Ming Yeh, Esquire **(Argued)**
Pennsylvania Institutional Law Project
718 Arch Street
Suite 304S
Philadelphia, PA 19106

      Counsel for Appellant Timothy A. Hale

Howard G. Hopkirk, Esquire **(Argued)**
Office of Attorney General of Pennsylvania
Strawberry Square
15th Floor
Harrisburg, PA 17102

      Counsel for Appellees

## AMENDED OPINION

**ROTH,** Circuit Judge:

Plaintiffs Domingo Colón Montañez and Timothy Hale appeal the District Court's order granting summary judgment in favor of the defendants on claims for damages and injunctive relief pursuant to 42 U.S.C. § 1983. Defendants are officials of the Pennsylvania Department of Corrections (DOC) and its related prisons. For the reasons that follow, we will affirm in part and reverse in part the District Court's judgment.

### I.

This appeal involves the consolidated challenges of two inmates in the Pennsylvania Department of Corrections prison system to the DOC's implementation of a program that automatically deducts funds from prisoners' inmate accounts to cover court-ordered restitution, fines, and costs. The DOC maintains bank accounts for the inmates incarcerated in its facilities. Inmates use the funds in these accounts to cover the costs of certain goods and services they purchase during their time of incarceration. The DOC provides for the most basic needs of the inmates—such as food and shelter—without charge to the inmates' accounts. Inmates must pay

for access to additional products and services, unless they qualify as indigent. For example, inmates must purchase items such as soap, deodorant, toothpaste, and over-the-counter medications. Inmates are also responsible for medical co-pays and the cost of access to legal services, although in some circumstances inmates' constitutional rights compel the DOC to provide access to these services without regard to inmates' ability to pay. *See, e.g.*, *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997). Inmates accrue money in their accounts through wages—capped at 51 cents an hour—for work conducted for the prison system or through gifts from friends and family.

In 1998, the Pennsylvania Legislature enacted Act 84, which amended section 9728(b) of the Pennsylvania Sentencing Code. Through these amendments, the legislature authorized the DOC "to make monetary deductions from inmate personal accounts for the purpose of collecting restitution or any other court-ordered obligation or costs." 42 Pa. Cons. Stat. § 9728(b)(5). Act 84 also directed that the "Department of Corrections shall develop guidelines relating to its responsibilities under this paragraph." *Id.*

The DOC exercised its obligation to develop guidelines relating to the collection of court-ordered monetary obligations of its inmates by promulgating policy DC-ADM-005, effective October 16, 1998 (the DOC Policy).[1] The current version of the Policy provides, in relevant part, that

---

[1] The DOC policy has been amended several times since its initial promulgation, most recently in October 2007. Neither party suggests that the amendments impact Plaintiffs' claims for damages or injunctive relief.

4

the business office of each DOC facility makes "payments of 20% of the inmate's account balance and monthly income for restitution, reparation, fees, costs, fines, and/or penalties associated with the criminal proceedings pursuant to" Act 84, "provided that the inmate has a balance that exceeds $10.00." The DOC's authority to make deductions is automatically triggered when it receives a sentencing order that includes a monetary portion. There is no requirement in the Policy that the relevant court order contain a provision for the automatic deduction of funds from an inmate account. The DOC does not provide inmates with any hearing or other opportunity to be heard before the deductions commence.

Montañez and Hale are two inmates in the DOC prison system who have had funds deducted from their inmate accounts pursuant to the DOC Policy. Each separately filed suit against DOC Secretary Jeffrey Beard, as well as other DOC officials responsible for processing the deductions (collectively, the Corrections Officials). The crux of both lawsuits is that the plaintiffs' procedural due process rights were violated when the Corrections Officials enforced the DOC Policy and made automatic deductions from the plaintiffs' inmate accounts.[2] Because these claims depend on the notice and process granted to each plaintiff, we will discuss the specific process given to each plaintiff in some detail.

A.

---

[2] In addition, Montañez asserted an additional claim that the DOC Policy violated his rights under the Equal Protection Clause of the Fourteenth Amendment.

On January 6, 2004, Hale was sentenced in a Pennsylvania criminal proceeding to 82 to 160 months in prison. As part of this sentence, Hale was ordered to pay restitution in the amount of $1,191.11, and a fine of $1,000. The sentencing judge also ordered Hale to pay an unspecified amount for "the cost of the proceeding." The final total of the costs, $1,462.53, was not determined until sometime after the sentencing hearing. The sentencing judge made no reference to Act 84 or the DOC's authority to make automatic deductions from funds held in an inmate account.

The parties dispute the exact parameters of the notice Hale received regarding the DOC Policy and Act 84 upon his intake to the DOC prison system. According to a sworn declaration submitted by the Corrections Officials, Hale underwent new prisoner orientation when he was first admitted, at which time he was informed that money could be deducted from his inmate account to satisfy court-ordered debts. The Corrections Officials also contend that Hale was shown a video orientation and given an inmate handbook that set forth pertinent provisions of the DOC's grievance and debt collection policies. Further, Hale's institutional file contains a form notice dated February 19, 2004—prior to the initiation of any deductions—which sets forth the substance of the DOC Policy. The record does not confirm, however, whether Hale actually received this form notice. Hale contradicts each of these assertions in a sworn declaration of his own. In particular, Hale asserts that he was never informed that the DOC would deduct funds from his inmate account and was unaware of the DOC Policy until after the deductions commenced.

6

Hale admits that, during his initial orientation, he received an inmate handbook, which contains an explanation of the inmate accounts. While the handbook does not contain a copy of the DOC Policy, it does contain two references to the DOC's ability to deduct funds from inmate accounts. In particular, the handbook explains, "If you were ordered to pay restitution, reparation, fees, costs, fines, and/or penalties associated with court proceedings, the DOC will collect monies from your account to pay those amounts." The handbook further provides:

> 1. In accordance with **42 Pa. C.S. §9728**, the DOC shall collect monies from your account if the court orders you to pay restitution, reparation, fees, costs, fines, and/or penalties associated with the criminal proceedings.
>
> 2. The DOC shall also collect court costs and filing fees as ordered by a court.
>
> . . .
>
> 7. For more information on the collection of debts, refer to DOC policy **DC-ADM 005**.

Hale also notes that there are several discrepancies with respect to his total amount of court-ordered restitution, fees, and costs. The judgment entered in Hale's criminal case indicates that he owed a total of $2,783.86, while his 300B

7

form[3] lists a total of $4,373.64. In addition, Hale's 300B form erroneously inflated the amount Hale owed in restitution by over $700.

It is undisputed that the DOC provided no opportunity for Hale to be heard regarding his record of court-ordered monetary obligations or the automatic deductions. Hale filed this lawsuit in the U.S. District Court for the Middle District of Pennsylvania on December 15, 2004.

B.

On January 7, 2000, Montañez participated in a Pennsylvania criminal sentencing hearing at which he received a sentence of 5.5 to 20 years in prison. Montañez was also ordered to pay restitution in the amount of $148.60, a fine in the amount of $100, and the costs of the prosecution. As with Hale, the costs portion of Montañez's sentence was not calculated until after the hearing. At no point did the sentencing judge explain that the DOC had the authority to automatically deduct 20% of Montañez's inmate account to pay these debts or otherwise refer to the DOC Policy.

Montañez asserts that he did not receive his 300B form or any other notice as to the total amount of his court-ordered

---

[3] The 300B is a form created by the DOC to assist it in determining the total amount of court-ordered obligations imposed on each inmate in the DOC system. The DOC provides these forms to the Court of Common Pleas for the county in which the inmate was sentenced. The Clerk of Court for each county supplies the information and fills out the form, which is then transmitted to the DOC.

8

obligations in time for him to move for reconsideration or file a direct appeal from the District Court's assessment of costs. Montañez did, however, file an appeal with respect to his conviction and sentence, and later filed petitions and other requests to modify his amounts owed.

As with Hale, the parties disagree as to the full extent of notice Montañez received regarding the DOC Policy upon his intake to the DOC prison system. Montañez asserts that he was never informed about the total amount of his court-ordered obligations, never received a copy of his 300B form, and was never informed about the DOC Policy. The Corrections Officials, on the other hand, dispute each of these claims. Both parties agree that the inmate handbook given to Montañez upon his admission to the DOC system contained no reference to the DOC policy. It is similarly undisputed that Montañez had no opportunity to be heard before the deductions commenced.

The DOC began deducting funds from Montañez's account pursuant to its policy on April 6, 2000. These deductions continued until 2010, when Montañez's debt was satisfied. Montañez admits that he received an inmate account statement every month, which included a debit described as "Act 84 transaction."

Montañez asserts that he was not aware of the import of this description, or of Act 84 or the DOC policy, until "sometime in 2002." Upon learning of the significance of these transactions, Montañez filed the first of a series of grievances with the DOC on November 17, 2002. These grievances were predicated on the fact that Montañez had not received any hearing to determine if he was able to afford the

9

deductions, and questioned the lack of a court order authorizing the deductions. The DOC rejected Montañez's grievance, stating that it would "continue to collect fines, restitution and costs from" Montañez "unless the sentencing court enters an order relieving" him from his obligations. On May 19, 2003, Montañez petitioned his sentencing judge seeking a copy of the order authorizing deductions from his account. The court denied this request, indicating that it had never entered an order initiating automatic deductions from Montañez's inmate account. Montañez filed this lawsuit in the U.S. District Court for the Middle District of Pennsylvania on November 29, 2004.

## C.

This is the third time these cases have been before our Court. In two previous appeals, we held that the allegations in the complaints submitted by Hale and Montañez were sufficient to state a claim that their due process rights were violated. *See Montañez v. Beard*, 344 F. App'x 833 (3d Cir. 2009) (*Montañez I*); *Hale v. Beard*, 168 F. App'x 532 (3d Cir. 2006).

After post-remand discovery, the District Court granted the Corrections Officials' motion for summary judgment on all claims. In particular, the District Court ruled that: (1) Montañez's claims were barred by the applicable statute of limitations; (2) Hale received all process he was due under the Constitution; and (3) the Corrections Officials were entitled to qualified immunity from all claims for monetary damages in any event. Plaintiffs appeal from that decision.

## II.

This Court reviews "an award of summary judgment *de novo*, applying the same test on review that the District Court should have applied" and views the facts in the light most favorable to the nonmoving party. *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011) (internal quotation marks omitted). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Similarly, qualified immunity "raises a purely legal issue" that this Court reviews de novo. *Burns*, 642 F.3d at 170.

For the reasons stated below, we will reverse the District Court's order with respect to Hale's due process claim for injunctive relief. We will affirm on all other grounds.

A.

Montañez argues that the District Court erred in concluding that his procedural due process claim was barred by the statute of limitations. The statute of limitations for a § 1983 claim arising in Pennsylvania is two years. *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). The District Court held that Montañez's cause of action accrued, at the latest, when he filed a grievance asserting that the deductions from his account were "unconstitutional and a violation of due process" on November 17, 2002. Because Montanez did not file his complaint in this action until November 29, 2004, the District Court concluded that Montañez's claims were untimely. We will affirm.

1.

11

The date of accrual in a § 1983 action is determined by federal law. *Kach*, 589 F.3d at 634. Under federal law, a cause of action accrues "'when the plaintiff knew or should have known of the injury upon which the action is based.'" *Id.* (quoting *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998)). Montañez argues that his cause of action accrued on November 27, 2002, because this was the date the DOC denied his grievance challenging the deductions.

Montañez's cause of action is based on the injury he allegedly suffered when the DOC applied the DOC Policy to his inmate account without due process. This Court has previously noted with regard to deductions from inmate accounts that an "alleged violation of [an inmate's] Fourteenth Amendment right to due process occur[s] at the moment he was deprived of his property interest without notice and a predeprivation hearing (i.e., when [prison] employees seized the money in his inmate account)." *Higgins v. Beyer*, 293 F.3d 683, 694 n.3 (3d Cir. 2002). Following this rule, Montañez's alleged injury occurred on April 6, 2000, when the DOC first deducted funds from his account.[4] It was at this point that the DOC deprived

---

[4] Montañez also argues that his cause of action did not accrue until he should have known that his due process rights had been violated. This is not correct; a cause of action accrues upon "a plaintiff's discovery of the actual, as opposed to the legal, injury . . .." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994). Montañez's actual injury occurred on the date that funds were deducted from his inmate account.

Montañez of his property interests, allegedly without due process. Montañez "knew or should have known of" this injury within a month of the first deduction, as he received an inmate account statement that reflected the debit from his account. *See Kach*, 589 F.3d at 634. As a result, Montañez's claim accrued in April or May of 2000, and the statute of limitations had expired by the time he filed his complaint in this action.

2.

Montañez seeks to avoid application of the statute of limitations by invoking the continuing violation doctrine. Under that doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks omitted).

There are several barriers that preclude Montañez from invoking this doctrine. Initially, the continuing violation doctrine does not apply when the plaintiff "is aware of the injury at the time it occurred." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6 (3d Cir. 2003). As we have just explained, Montañez was aware of the relevant injury—the government seizure of funds from his inmate account—very shortly after it occurred. Despite this knowledge, Montañez failed to assert his rights in a timely fashion.

Furthermore, Montañez's argument that he suffered a continuing violation is based on the fact that the DOC continued to make deductions from his account. But a "continuing violation is occasioned by continual unlawful

13

*acts*, not continual ill effects from an original violation." *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 423 (3d Cir. 2005) (emphasis added) (internal quotation marks omitted). The DOC's decision to enforce the DOC Policy against Montañez and its first deduction from his prison account constituted a discrete and independently actionable act, which triggered Montañez's obligation to assert his rights. The fact that the DOC made subsequent deductions pursuant to the DOC Policy does not make out a continuing violation. *See Cowell*, 263 F.3d at 292–93.

3.

In addition to his arguments regarding accrual, Montañez also argues that the statute of limitations should be equitably tolled, either because the DOC "fraudulently concealed its responsibility for the deductions" or because Montañez engaged in the inmate grievance process to settle his claims. We disagree, and find no basis to equitably toll the statute of limitations.

Generally, "state tolling principles also govern § 1983 claims" unless they conflict with "federal law or policy." *Kach*, 589 F.3d at 639. "Pennsylvania's fraudulent concealment doctrine tolls the statute of limitations where 'through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry.'" *Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006) (quoting *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir. 1985)). Even if a plaintiff can establish that the defendant engaged in fraudulent concealment, the statute of limitations "begins to run when the injured party knows or reasonably should know of his

14

injury and its cause." *Fine v. Checcio*, 870 A.2d 850, 861 (Pa. 2005).

Montañez argues that the DOC "fraudulently concealed its responsibility for the deductions" by suggesting that he take his complaints about the deductions to his sentencing court. The statements Montañez identifies, however, were made in response to the grievances he filed more than two years after his cause of action accrued. As a result, any alleged fraud by the DOC could not possibly have been the reason that Montañez delayed asserting his rights. *See Uber v. Slippery Rock Univ. of Pa.*, 887 A.2d 362, 366 (Pa. Commw. Ct. 2005). When he finally did file a grievance, it requested "inmate account staff and business office staffs [*sic*] to stop deducting 20% out of" the funds in his account, which shows that Montañez was not confused about the source of his injury. In other words, Montañez waited over two years after learning of the deductions to take any action to protect his rights. Montañez simply delayed too long to take advantage of equitable tolling doctrines.[5]

---

[5] Montañez also argues that the statute of limitations should be tolled while he exhausted his administrative remedies. Specifically, he argues that the limitations period should be tolled from November 17, 2002, when he filed his first grievance, until December 5, 2003, when the DOC denied his last grievance. But Montañez's claim accrued in April or May of 2000. Thus, even if the administrative process could toll the statute of limitations, the complaint would still be untimely because Montañez waited too long to file his first grievance.

15

In sum, the statute of limitations on Montañez's claims expired before he initiated this lawsuit, and no basis for equitable tolling applies. We will therefore affirm the District Court's holding that Montañez's claims are time-barred.[6] Because there is no question that Hale's due process claim was timely filed, however, we will now consider the merits of his appeal.

B.

To analyze a claim for procedural due process, a court "must first 'determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment.'" *Evans v. Secretary Pa. Dep't of Corr.*, 645 F.3d 650, 663 (3d Cir. 2011) (quoting *Newman v. Beard*, 617 F.3d 775, 782 (3d Cir. 2010)). If the court determines that "the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it." *Newman*, 617 F.3d at 783 (citation omitted) (internal quotation marks omitted).

Both parties agree that inmates have a constitutional property interest in funds held in prison accounts. *See Reynolds*, 128 F.3d at 179. Thus, the only remaining question on the merits of Hale's due process claim is whether the Corrections Officials provided sufficient process when they

---

[6] Because we hold that Montañez's claims are barred by the statute of limitations, we need not consider his argument that the District Court erred by failing to consider his claims under the Equal Protection Clause of the Fourteenth Amendment.

16

implemented the DOC Policy and deducted funds from Hale's inmate account.

1.

Before turning to the merits of Hale's due process challenge, we wish to emphasize the narrowness of Hale's constitutional claim. Hale does not seek in this action to challenge the final amount of fines, restitution, and costs imposed against him by the sentencing judge in his state criminal proceeding. Nor does he otherwise seek to undermine the validity of his criminal sentence. Such a challenge would not be cognizable in a § 1983 action unless the prisoner could prove that he had previously obtained a favorable termination of his state court criminal proceeding. *See, e.g.*, *Heck v. Humphrey*, 512 U.S. 477 (1994); *Gilles v. Davis*, 427 F.3d 197, 208–09 (3d Cir. 2005). Further, Hale does not suggest that any additional process must be given by the Pennsylvania courts rather than DOC administrators. *Cf. Buck v. Beard*, 879 A.2d 157 (Pa. 2005) (rejecting the argument that the due process considerations require a *judicial* default hearing before deductions may be made from inmate accounts).

Instead, Hale's due process claim is narrowly focused on whether inmates must be provided with notice of the DOC Policy and an opportunity to be heard regarding application of the Policy prior to the first deduction,[7] and, if they must,

---

[7] As Hale's counsel acknowledged during oral argument, Hale seeks only notice and a single opportunity to be heard prior to the first deduction. He does not argue that inmates must

whether the current procedures implemented by the Corrections Officials are sufficient. It is to these narrow issues that we now turn.

2.

The District Court ruled that the DOC's post-deprivation grievance procedures are sufficient to meet Hale's procedural due process rights, and that no pre-deprivation hearing was required. We disagree and will reverse.

Procedural due process claims are governed by the standard first enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Under that standard, a court is to weigh three factors: (1) "the private interest that will be affected by the official action", (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the value of "additional or substitute procedural safeguards", and (3) the governmental interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Id.*

State prisoners plainly have a property interest in the funds in their inmate accounts. *See, e.g.*, *Reynolds*, 128 F.3d at 179. As other courts have held, however, this interest is reduced because inmates "are not entitled to complete control over their money while in prison." *See Mahers v. Halford*, 76 F.3d 951, 954 (8th Cir. 1996). Further, the government has

receive notice and an opportunity to be heard prior to each and every subsequent deduction.

18

an "important state interest" in collecting restitution, costs, and fines from incarcerated criminal offenders to compensate victims. *See id.* at 956.

The question remains, however, whether additional pre-deprivation process would be effective and whether that process would be overly burdensome on the government. As a default matter, "[i]n situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). Thus, where the pre-deprivation safeguards "would be of use in preventing the kind of deprivation alleged," the state must provide such a hearing. *Id.* at 139. We have previously applied this default rule to state actions pursuant to "an established state procedure" that would deprive inmates of the funds in their inmate accounts. *Higgins*, 293 F.3d at 694; *see also Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 171–73 (3d Cir. 2011).

Where pre-deprivation process is not feasible, this default rule does not apply. Thus, in the "unusual case" where "the value of predeprivation safeguards . . . is negligible in preventing the kind of deprivation at issue," the state is not constitutionally required to provide any pre-deprivation process. *Zinermon*, 494 U.S. at 129. Following this rule, we have held that assessments against inmate accounts to defray the costs of medical treatment, *Reynolds*, 128 F.3d 166, or the application of a fixed fee to defray the costs of room and board, *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410 (3d Cir. 2000), present the types of situations where pre-deprivation hearings are impractical or would be meaningless. Most pertinently, the court in *Tillman*

reasoned that a program involving "routine matters of accounting, with a low risk of error," requires no pre-deprivation process. *Id.* at 422.

Taken together, these cases make clear that when pre-deprivation process could be effective in preventing errors, that process is required. *See Burns*, 642 F.3d 163; *Higgins*, 293 F.3d at 693–94. When deductions from inmate accounts involve "routine matters of accounting" based on fixed fees or where temporal exigencies require immediate action, pre-deprivation hearings are not required. *Tillman*, 221 F.3d at 422; *Reynolds*, 128 F.3d at 180. In either event, however, inmates are entitled to some pre-deprivation notice of the prison's deduction policy. *See Reynolds*, 128 F.3d at 180.

Applying this distinction, we find that the District Court erred in determining that pre-deprivation process was not constitutionally required. Unlike the cases in which we have held that pre-deprivation process is unnecessary, there is nothing about the DOC Policy that requires the DOC to take immediate action to deduct funds from inmate accounts to satisfy court-ordered obligations. Any short delay that might result from offering inmates an opportunity to be heard on application of the DOC Policy before it is applied would not seriously undermine the Commonwealth's ability to recover costs.

The DOC Policy does not involve fixed assessments that uniformly apply to all inmates. Each inmate in the DOC system has a unique judgment, with individualized amounts of court-ordered obligations. This case is thus unlike the room-and-board assessments in *Tillman*, which were a fixed $10 daily charge for each inmate. *Tillman*, 221 F.3d at 414.

20

For this reason, the DOC's process of seeking deductions is not a mere "accounting" issue that applies a fixed dollar amount per day to each inmate. *Id.* at 422. It requires individualized process to determine each inmate's total cost prior to the commencement of the deductions.

Further, additional pre-deprivation process would mitigate at least some risk of error in the application of the DOC Policy. Viewing the evidence in his favor, Hale did not obtain individualized information as to how much he actually owed for costs, fines, and restitution prior to deductions being made. Hale had no opportunity to object to the total amounts entered into the DOC system. In fact, Hale's 300B form erroneously inflated the amount of his court-ordered restitution by nearly $800. This error might have been prevented if Hale had been provided with a pre-deprivation opportunity to review his personalized information and lodge objections to the deductions. In other cases, a pre-deprivation opportunity to object to the assessments might prevent deductions from being made from funds exempt from the DOC's policy. *See Higgins*, 293 F.3d at 694 (suggesting that a pre-deprivation hearing might have prevented prison administrators from improperly seizing VA benefits).

Requiring that the DOC provide pre-deprivation process need not be administratively burdensome. Other jurisdictions have been able to implement pre-deprivation process in similar circumstances. The State of Iowa, which requires nearly all of its criminal offenders to pay restitution while incarcerated, requires that prison administrators provide "[w]ritten notice of the amount of the deduction . . . to the inmate, who shall have five days after receipt of the notice to submit in writing any and all objections to the deduction."

Iowa Code § 904.702(1); *see also Walters v. Grossheim*, 525 N.W.2d 830, 832–33 (Iowa 1994) (holding that due process considerations required similar procedures). In Ohio, prison administrators must provide "notice to the inmate of the debt and its intent to seize money from the inmate's account," "inform the inmate of a right to claim exemptions," and provide the inmate with "an opportunity to assert any exemption or defense" before any money may be withdrawn from the account. *State v. Peacock*, 2003-Ohio-6772 (Ct. App. 2003); *see also* Ohio Admin. Code 5120-5-03(C).

In sum, considering the factors required by *Mathews*, the government's interest in collecting restitution, fines, and other costs from convicted criminals does not overcome the default requirement that inmates be provided with process before being deprived of funds in their inmate accounts. The District Court therefore erred in holding that the DOC's post-deprivation grievance procedures were all that the Constitution required.

3.

Having determined that no sufficient reason exists to deviate from the default of pre-deprivation notice and an opportunity to be heard, we now consider whether Hale received sufficient process in this case. The Corrections Officials argue that Hale's sentencing hearing and subsequent appellate rights provide all the pre-deprivation process Hale is due. We disagree and hold that Hale's sentencing hearing was insufficient to satisfy the Due Process Clause of the Fourteenth Amendment.

The Corrections Officials' argument primarily relies on the decision in *Buck v. Beard*, 879 A.2d 157, 161 (Pa. 2005). In *Buck*, the Pennsylvania Supreme Court held that the Pennsylvania and federal Constitutions did not require the DOC to obtain a judicial determination of ability to pay prior to deducting funds from an inmate account. *Id.* at 159–60. As the prior Third Circuit panel in this very case noted, the "Court's reasoning in *Buck* informs our analysis," but "it is not dispositive." *Montañez I*, 344 F. App'x at 835.

The simple response to the Corrections Officials' reliance on *Buck* is that we largely agree with that decision. Pennsylvania need not provide an additional judicial hearing for every inmate to determine ability to pay before making deductions from their inmate account when the sentencing court has already considered the inmate's ability to pay when entering the sentence. *See* 42 Pa. Cons. Stat. § 9726(d) ("In determining the amount and method of payment of a fine, the court shall take into account the financial resources of the defendant and the nature of the burden that its payment will impose."). Hale's challenge, however, is not that the DOC must provide a *judicial* default hearing prior to the commencement of inmate deductions. Rather, Hale argues that, regardless of the source of the information, inmates must be at least notified of the DOC Policy and the final amount of costs to be deducted and be given an opportunity to be heard on objections to the amounts prior to the deductions. *Buck* simply does not address this argument.

Our prior cases make plain that the mere fact that an inmate's sentence includes a fine, coupled with a state statute compelling prison administrators to deduct funds from the inmate's prison account, does not satisfy the requirements of

23

pre-deprivation due process.  *Higgins*, 293 F.3d at 694.  In *Higgins*, we considered a similar cost recovery scheme in New Jersey and held that the inmate had "alleged sufficient facts to establish that he was entitled to a predeprivation notice and hearing" despite the fact that he had an opportunity to challenge the monetary portion of his judgment during sentencing.  *Id.*  Similarly, the existence of a general statutory provision and implementing regulations providing the DOC with authority to collect funds from inmates' accounts does not satisfy the Commonwealth's obligation to provide prior notice and an opportunity to be heard to inmates regarding deductions from inmate accounts.  *See Montanez I*, 344 F. App'x at 835–36 ("[A] general statement of financial obligations and notice of the state's ability to debit an unspecified amount from an inmate account does not settle the legal question of whether violations of due process occurred . . ..").

At a minimum, federal due process requires inmates to be informed of the terms of the DOC Policy and the amount of their total monetary liability to the Commonwealth.  *See Higgins*, 293 F.3d at 694.  In particular, the DOC must disclose to each inmate before the first deduction:  the total amount the DOC understands the inmate to owe pursuant to the inmate's sentence; the rate at which funds will be deducted from the inmate's account; and which funds are subject to deduction.  Further, inmates must have a meaningful opportunity to object to the application of the DOC Policy to their inmate accounts before the first deductions commence.  This opportunity to object is required to protect against the possibility of error in the application of the DOC Policy, such as mistakes in reporting of an inmate's total liability or to ensure that deductions are not made from

24

funds that are exempt. *See Id.* at 693 (Veterans Administration disability benefits are not subject to deduction to satisfy criminal fines).

To be clear, we do not suggest that the DOC must provide each inmate with a formal, judicial-like hearing before the onset of deductions. Moreover, we find nothing substantively unreasonable about the DOC's refusal to provide exceptions to its across-the-board 20% rate of deduction, in light of the fact that the DOC will not make deductions when an inmate's account falls below a certain minimum. Because we find the deduction rate to be reasonable, the DOC need not entertain a challenge to the rate of deduction, though it must provide an opportunity for inmates to object to potential errors in the deduction process.

We also do not mean to suggest that inmates must have an opportunity to be heard prior to each deduction. Rather, after providing the required initial notice the DOC could provide inmates with an informal opportunity to supply written objections to prison administrators prior to the first deduction. *See, e.g.*, Iowa Code § 904.702(1); Ohio Admin Code 5120-5-03(C). We need not set forth specific procedures, and the DOC retains discretion, consistent with its constitutional obligations, to implement such procedures in a flexible and cost-effective manner.

4.

Applying these principles to Hale's case, there exist genuine disputes of material fact that preclude summary judgment for the Corrections Officials. First, Hale's sentencing hearing, standing alone, did not satisfy his federal

due process rights with regard to deductions pursuant to the DOC Policy. *See Montañez I*, 344 F. App'x at 836. At no point during the sentencing hearing was Hale ever informed of the DOC Policy or of the fact that the DOC would automatically deduct 20% of all funds to pay for the monetary portion of Hale's sentence. Second, the parties submitted conflicting evidence as to the exact extent of the notice Hale received regarding his sentence and the DOC Policy. The Corrections Officials submitted a declaration asserting that during new inmate orientation, Hale received an inmate handbook that set forth "pertinent provisions" of the DOC Policy, was orally informed of the Policy, and was shown an orientation video that also included a description of the Policy. Further, a document in the record from Hale's institutional file, dated prior to the first deduction from Hale's account, contains a form notice outlining the parameters of the DOC Policy.

Although Hale admits that he received the inmate handbook, he specifically denies that the DOC informed him that funds would be taken from his account or the rate at which it would be deducted. Notably, the inmate handbook Hale received did not explain the 20% deduction rate. Hale also specifically denies that he received any memo or other notice regarding the DOC Policy. In addition, Hale states that he only learned that funds would be deducted from his inmate account after the first such deduction. There is also a dispute of fact as to whether Hale was promptly informed of the total amount of his criminal judgment because it was sent to his home address while he was incarcerated. Moreover, the Corrections Officials concede that Hale was not provided with any opportunity to be heard before the DOC began making deductions to his account.

26

Because disputes of fact exist regarding notice and because Hale never had any opportunity to be heard prior to being deprived of funds in his inmate account, we will reverse the District Court's order granting summary judgment to the Corrections Officials.

## C.

Hale also argues that the District Court erred in holding that the DOC was entitled to qualified immunity with regard to Hale's claims for monetary relief. We will affirm the District Court on this issue.

"Qualified immunity shields government officials from suit even if their actions were unconstitutional as long as those officials' actions 'd[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Burns*, 642 F.3d at 176 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (alteration in original).

At the time that the deductions from Hale's account first occurred in February 2004, it was not clearly established in this Court that the failure to provide prison inmates with a pre-deprivation opportunity to object to automatic deductions from their prison accounts violated the Due Process Clause. In 2005, the Pennsylvania Supreme Court decided *Buck v. Beard*, which could be read to suggest that a sentencing hearing was the only pre-deprivation hearing constitutionally required. 879 A.2d 157 (Pa. 2005). Further, earlier decisions

of our Court had held that, in some circumstances, post-deprivation remedies were sufficient constitutional process for deductions. *See, e.g.*, *Tillman*, 221 F.3d at 422. For these reasons, there was a sufficient lack of clarity in Third Circuit and Pennsylvania case law regarding automatic deductions that the Corrections Officials should be entitled to qualified immunity in this case.

Hale also argues that certain of the defendants are not entitled to qualified immunity because they performed only ministerial functions. Some courts have held that government officials conducting ministerial acts are not entitled to qualified immunity. *See, e.g.*, *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001). Hale's claim, however, is predicated on the discretionary decision regarding the necessity or not of a predeprivation hearing and the nature of that hearing. Therefore, qualified immunity applies.

The fact that the defendants are entitled to qualified immunity on Hale's damages claim does not prevent this case from moving forward on Hale's claim for injunctive relief. *Hill v. Borough of Kutztown*, 455 F.3d 225, 244 (3d Cir. 2006) ("[T]he defense of qualified immunity is available only for damages claims—not for claims requesting prospective injunctive relief."). As a result, Hale may still proceed to trial on his claim for injunctive relief.

III.

For the foregoing reasons, we will reverse the District Court's order to the extent that it granted summary judgment to the Corrections Officials on Hale's due process claim, and will remand this case for further proceedings regarding Hale's

28

claim for injunctive relief.  We will affirm the District Court's order in all other respects.