**[J-32-2023] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| THOMAS WASHINGTON, | : | No. 13 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 485 |
| | : | MD 2020 dated December 30, 2021 |
| v. | : | |
| | : | ARGUED:  May 24, 2023 |
| | : | |
| THE PA DEPARTMENT OF | : | |
| CORRECTIONS, | : | |
| | : | |
| Appellee | : | |

## DISSENTING OPINION

**JUSTICE BROBSON**                                    **DECIDED:  December 19, 2023**

I respectfully dissent.  In my view, the Pennsylvania Department of Corrections' (DOC) promulgation and implementation of its Act 84[1] policy requiring it to make monthly deductions from an inmate's account at the statutorily mandated minimum deduction rate of 25% if an inmate's account balance exceeds $10.00 constitutes a legislative action; therefore, Appellant Thomas Washington (Washington) is not entitled to any procedural due process in addition to what he already received prior to DOC's initial Act 84 deduction from his inmate account.  Accordingly, I would affirm the Commonwealth Court's order sustaining DOC's preliminary objection in the nature of a demurrer to Washington's petition for review (Petition).

By way of brief background, in 1998, the General Assembly enacted Act 84, which provided, in relevant part, that DOC "shall be authorized to make monetary deductions from inmate personal accounts for the purpose of collecting restitution or any other court-ordered obligation . . . [and that DOC] shall develop guidelines relating to its

_____

[1] Act of June 18, 1998, P.L. 640, No. 84, *as amended*, 42 Pa. C.S. § 9728(b)(5).

responsibilities" associated therewith. 42 Pa. C.S. § 9728(b)(5) (amended 2019). Notably, at that time, Act 84 did not specify a rate of deduction; instead, it allowed DOC to establish the rate by which restitution and other court-ordered obligations would be deducted from inmate accounts. *See id.* In turn, DOC promulgated and thereafter implemented a policy, which provided, in relevant part, that "the business office will deduct from an inmate's account monthly payments of 20% of the preceding month's income provided the account balance exceeds $10.00." DC-ADM 005 (effective October 16, 1998, through January 14, 2020).

In 2015, Washington entered a plea of nolo contendere to charges of aggravated assault on a police officer and persons not to possess a firearm, and the trial court sentenced him to five to ten years' incarceration in accordance with a plea agreement entered into between Washington and the Commonwealth. As part of his sentence, the trial court ordered Washington to pay restitution in the amount of $15,666.49 and the costs associated with his prosecution in the amount of $1,341.55. It is undisputed that, at that time, Washington was on notice that, pursuant to Act 84 and DOC's policy, DOC would make automatic deductions from his inmate account at a rate of 20% as a means to satisfy those financial obligations. Washington did not raise any concerns regarding the amount of his court-ordered restitution and costs or the rate of DOC's Act 84 deductions, and DOC began its monthly Act 84 deductions from Washington's inmate account at a rate of 20%.

In 2019, however, the General Assembly amended Act 84, and, in its current form, it now provides, in pertinent part:

(5) Deductions [from inmate accounts] shall be as follows:

(i) [DOC] shall make monetary deductions of at least 25% of deposits made to inmate wages and personal accounts for the purpose of collecting restitution, costs . . . , filing fees . . . , and any other court-ordered obligation.

. . . .

(iv) [DOC] . . . shall develop guidelines relating to its responsibilities under this paragraph. The guidelines shall be incorporated into any contract entered into with a correctional facility.

42 Pa. C.S. § 9728(b)(5)(i), (iv). In response, DOC updated/amended its Act 84 policy to provide, in relevant part, that "the business office will . . . deduct from the inmate's account monthly payments for 25% of the preceding month's income provided the account balance exceeds $10.00." Consequently, DOC increased the amount of its monthly Act 84 deductions from Washington's inmate account from 20% to 25%. Subsequent thereto, on August 25, 2020, Washington filed his Petition with the Commonwealth Court, contending that DOC violated his procedural due process rights guaranteed by the Fourteenth Amendment to the United States Constitution by failing to provide him with notice and an opportunity to be heard before it increased the rate of its Act 84 deductions from his inmate account from 20% to 25%. The Commonwealth Court concluded that, because Washington only complained about the increased rate of DOC's Act 84 deductions from Washington's inmate account and DOC lacked the discretion to alter the rate of those deductions, there was no procedural due process violation, and, therefore, the Commonwealth Court sustained DOC's preliminary objection in the nature of a demurrer to Washington's Petition.

Article I, Section 1 of the Pennsylvania Constitution "establishes the right of 'acquiring, possessing and protecting property . . . [,]' [and this Court has] said that '[t]he requirements of [Article I, Section 1] are not distinguishable from those of Section 1 of the Fourteenth Amendment to the Federal Constitution—nor shall any State deprive any person . . . of property, without due process of law . . . .'" *R. v. Dep't of Pub. Welfare*, 636 A.2d 142, 152 (Pa. 1994) (some alterations in original) (quoting *Best v. Zoning Bd. of Adjustment*, 141 A.2d 606, 609 (Pa. 1958)). Procedural due process "is a

flexible concept which 'varies with the particular situation.'" *Bundy v. Wetzel*, 184 A.3d 551, 557 (Pa. 2018) (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)). "The central demands of due process are notice and an 'opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Commonwealth v. Maldonado*, 838 A.2d 710, 714 (Pa. 2003)). "It is well settled[, however,] that procedural due process concerns are implicated only by adjudications, not by state actions that are legislative in character." *Small v. Horn*, 722 A.2d 664, 671 (Pa. 1998). Section 101 of the Administrative Agency Law defines an "adjudication" as "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." 2 Pa. C.S. § 101. "Adjudicative actions are those that affect one individual or a few individuals[] and apply existing laws or regulations to facts that occurred prior to the adjudication." *Small*, 722 A.2d at 671 n.12 (citing 2 Pa. C.S. § 101). "Agency actions that are legislative in character result in rules of prospective effect and bind all, or at least a broad class of, citizens." *Id.*

This distinction between adjudicative and legislative actions was first drawn by the United States Supreme Court in *Londoner v. City and County of Denver*, 210 U.S. 373 (1908), and *Bi-Metallic Investment Company v. State Board of Equalization*, 239 U.S. 441 (1915) (*Bi-Metallic*). In *Londoner*, the plaintiffs claimed that they were entitled to notice and an opportunity to be heard prior to the assessment of a tax against their land for the cost of paving a street that abutted that land. *Londoner*, 210 U.S. at 374. Agreeing with the plaintiffs, the United States Supreme Court explained that,

> where the legislature of a state, instead of fixing the tax itself, commits to some subordinate body the duty of determining whether, in what amount, and upon whom it shall be levied, and of making its assessment and apportionment, due process of law requires that, at some stage of the proceedings, before the tax becomes irrevocably fixed, the taxpayer shall

have an opportunity to be heard, of which he must have notice, either personal, by publication, or by a law fixing the time and place of the hearing.

*Id.* at 385-86.

Conversely, in *Bi-Metallic*, the plaintiff claimed that it was entitled to notice and an opportunity to be heard prior to the implementation of a 40% increase in the valuation of its property and all other taxable property located in Denver, Colorado. *Bi-Metallic*, 239 U.S. at 443. This time disagreeing with the plaintiff, the United States Supreme Court explained that,

> [w]here a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The [United States] Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Id.* at 445. The United States Supreme Court continued that, in circumstances like those presented, "[t]here must be a limit to individual argument . . . if government is to go on." *Id.* Distinguishing the circumstances of *Bi-Metallic* from *Londoner*, the United States Supreme Court noted that, in the latter, "[a] relatively small number of persons was concerned, who were exceptionally affected, in each case upon individual grounds, and [,therefore,] it was held that they had a right to a hearing." *Id.* at 446. The United States Supreme Court further stated that its decision in *Londoner* "is far from reaching a general determination dealing only with the principle upon which all assessments in a county had been laid." *Id.*

This Court has similarly distinguished between adjudicative and legislative actions in determining whether procedural due process rights are implicated in situations where DOC issues amendments to its policies that apply with equal force to all inmates. In *Small*, certain inmates brought an action against DOC, claiming that they had a right to

possess and wear civilian clothing[2] and that DOC's amendment to its prisoner clothing policy[3] deprived them of that right without due process of law as guaranteed under the Pennsylvania Constitution. *Small*, 722 A.2d at 667. More specifically, the inmates maintained that they could not be deprived of their right to property without a hearing to determine the value of the clothing that was taken from them and the amount of the compensation that they would receive as a result thereof. *Id.* at 671. Disagreeing with the inmates' position, this Court concluded that DOC's issuance of its amended prisoner clothing policy was not an adjudication, and, therefore, the inmates could not succeed under their procedural due process theory. *Id*.

Relying on *Small*, this Court, in *Sutton v. Bickell*, 220 A.3d 1027 (Pa. 2019), concluded that DOC did not violate an inmate's procedural due process rights by mandating, through the issuance of a memorandum, that inmates were prohibited from purchasing and possessing Rocky and Timberland-style boots. *Sutton*, 220 A.3d at 1030, 1032. The inmate generally claimed that DOC's actions "failed to comport with due process requirements attendant to the deprivation of a property right." *Id.* at 1032. In rejecting that claim, this Court explained that, "[l]ike the [amended prisoner clothing policy] at issue in [*Small*], the [m]emorandum sets forth rules of prospective effect that

---

[2] The inmates claimed that their right to possess and wear civilian clothing emanated from a consent decree that DOC entered into with a court-certified plaintiff class known as the Imprisoned Citizens Union, which the United States District Court for the Eastern District of Pennsylvania approved in 1978. *Small*, 722 A.2d at 666. The consent decree required DOC to permit inmates to wear civilian clothing when housed in general population, subject, of course, to DOC's right to impose reasonable regulations addressing safety, sanitation, and security concerns. *Id.*

[3] DOC's amended prisoner clothing policy provided a restricted list of clothing that inmates were permitted to purchase and wear that were more in the nature of prison uniforms than civilian clothing. *Small*, 722 A.2d at 666-67. The amended policy also provided that all nonconforming clothing had to be removed from the prisons, and, if an inmate was discovered in possession of nonconforming clothing, that inmate would be subject to disciplinary measures. *Id.* at 667.

bind a broad class of individuals in Pennsylvania state prisons. It does not apply [to] existing laws or regulations in a manner that affects only one or several citizens[, and, t]hus, procedural due process principles are not implicated by the [inmate's] averments." *Id.*

Here, Washington contends that his procedural due process rights were violated because DOC did not provide him with notice and an opportunity to be heard before it increased the rate of its Act 84 deductions from his inmate account from 20% to 25%. I disagree. In my view, DOC's promulgation and implementation of its Act 84 policy constitutes a legislative action, not an adjudicatory action, and, therefore, Washington is not entitled to any process in addition to that which he already received prior to DOC's initial Act 84 deduction from his inmate account. DOC's Act 84 policy applies equally to all inmates, and DOC has no discretion in its application to those inmates: if an inmate owes a court-ordered financial obligation and that inmate has an account balance in excess of $10.00, then DOC is required under its policy to deduct 25% of the preceding month's income from the inmate's account. In other words, DOC is not applying its Act 84 policy to facts applicable to a single inmate that occurred prior to the policy's promulgation and implementation or making any determination relative to that inmate's individual situation. *See Small*, 722 A.2d at 671 n.12 (citing 2 Pa. C.S. § 101). Rather, DOC is applying its Act 84 policy uniformly to all inmates without any consideration of an inmate's individual circumstances. DOC's Act 84 policy essentially provides that if certain facts are present—*i.e.*, an inmate owes a court-ordered financial obligation and has an account balance in excess of $10.00—then DOC *"will"* deduct 25% of the preceding month's income from that inmate's account. DOC's Act 84 policy affords it no discretion to act

otherwise under those circumstances.[4]  Importantly, Washington has made no allegation that DOC has applied its Act 84 policy differently among inmates.[5]  DOC's Act 84 policy is the epitome of a legislative action—*i.e.*, an agency action that binds a large class of citizens, in this case all inmates under DOC's supervision who have outstanding court-ordered financial obligations.  *See Small*, 722 A.2d at 671 n.12.  Given that DOC's promulgation and implementation of its Act 84 policy constitutes a legislative action, Washington's procedural due process rights could not have been implicated.  *Id.* at 671.

The majority, nevertheless, concludes that DOC violated Washington's procedural due process rights by increasing the rate of its Act 84 deductions from his inmate account from 20% to 25% without first providing him with notice and an opportunity to be heard. In so doing, the majority relies upon, *inter alia*, *Montanez v. Secretary Pennsylvania Department of Corrections*, 773 F.3d 472 (3d Cir. 2014), a decision that was issued pursuant to the pre-amended version of Act 84 when DOC's deduction rate was set by its Act 84 policy at 20%.  In *Montanez*, although it did not specifically utilize the terms "adjudicative action" and "legislative action" and/or discuss the distinction between the

_____

[4] If, on the other hand, DOC's Act 84 policy provided that DOC *may* deduct 25% of the preceding month's income from the inmate's account if those same facts are present, then one could argue that DOC would be exercising its discretion in deciding whether to apply its Act 84 policy to a specific inmate and make a deduction from that inmate's account.

[5] To the extent that the majority relies upon the portion of DOC's policy providing that it will not make any deductions from an inmate's account if the preceding month's balance does not exceed $10.00 to conclude that DOC somehow exercised discretion or made an individualized determination, I question whether DOC even has the authority to do so given that Act 84, as amended, does not permit DOC to deviate below the minimum 25% deduction rate.  The issue of DOC's authority as it relates to the $10.00 minimum inmate account balance, however, is not before the Court.  Additionally, the $10.00 minimum balance requirement does not in any way permit DOC to exercise discretion or make an individualized determination; rather, as stated above, pursuant to its Act 84 policy, DOC is required to deduct 25% of the preceding month's income from an inmate's account if that inmate owes a court-ordered financial obligation and that inmate's account balance exceeds $10.00.

two, the United States Court of Appeals for the Third Circuit appears to have engaged in an adjudicative versus legislative action analysis to determine whether an inmate was entitled to notice and an opportunity to be heard prior to DOC's first Act 84 deduction from his inmate account—*i.e.*, an "across-the-board 20% rate of deduction." *See Montanez*, 773 F.3d at 482-87. The inmate, as part of his sentence, was ordered to pay restitution, a fine, and the costs of his prosecution. *Id.* at 477. The total amount of the inmate's court-ordered restitution, fines, and costs was not determined until sometime after the sentencing hearing, and there was a discrepancy between the court-ordered amount of his financial obligation and the amount entered into DOC's system. *Id.* at 477-78. In addition, at the time of the sentencing hearing, the trial court made no reference to Act 84 or DOC's authority to make automatic deductions from the inmate's account to pay his court-ordered restitution, fines, and costs. *Id.* at 477.

The Third Circuit ultimately concluded that, "[a]t a minimum, federal due process requires inmates to be informed of the terms of . . . DOC['s p]olicy and the amount of their total monetary liability to the Commonwealth" before DOC may make deductions from their inmate accounts pursuant to Act 84 and DOC's Act 84 policy. *Id.* at 486. The Third Circuit explained that, to satisfy this minimum obligation, DOC is required to "disclose to each inmate before the first deduction: the total amount . . . DOC understands the inmate to owe pursuant to the inmate's sentence; the rate at which funds will be deducted from the inmate's account; and which funds are subject to deduction." *Id.* The Third Circuit further explained that "inmates must [then] have a meaningful opportunity to object to the application of . . . DOC['s p]olicy to their inmate accounts before the first deductions commence . . . [in order to] protect against the possibility of error in the application of . . . DOC['s p]olicy, such as mistakes in reporting of an inmate's total liability or to ensure that

deductions are not made from funds that are exempt." *Id.* In reaching this conclusion, the Third Circuit Court reasoned:

> DOC['s p]olicy does not involve fixed assessments that uniformly apply to all inmates. Each inmate in . . . DOC['s] system has a unique judgment, with individualized amounts of court-ordered obligations. This case is thus unlike the room-and-board assessments in *Tillman* [*v. Lebanon County Correctional Facility*, 221 F.3d 410 (3d Cir. 2000),] which were a fixed $10.00 daily charge for each inmate. For this reason, . . . DOC's process of seeking deductions is not a mere "accounting" issue that applies a fixed dollar amount per day to each inmate. It requires individualized process to determine each inmate's total cost prior to the commencement of the deductions.
>
> Further, additional pre-deprivation process would mitigate at least some risk of error in the application of . . . DOC['s p]olicy. Viewing the evidence in his favor, [the inmate] did not obtain individualized information as to how much he actually owed for costs, fines, and restitution prior to deductions being made. [The inmate] had no opportunity to object to the total amounts entered into . . . DOC['s] system. In fact, [the inmate's DOC] form erroneously inflated the amount of his court-ordered restitution by nearly $800. This error might have been prevented if [the inmate] had been provided with a pre-deprivation opportunity to review his personalized information and lodge objections to the deductions. In other cases, a pre-deprivation opportunity to object to the assessments might prevent deductions from being made from funds exempt from the DOC's policy.

*Id.* at 484 (citations omitted).

Similarly, in *Bundy*, one of the other decisions upon which the majority relies and which was also decided pursuant to the pre-amended version of Act 84, an inmate was subject to certain financial obligations as a result of his criminal convictions in two separate counties. *Bundy*, 184 A.3d at 554. The trial court in at least one of those counties did not inform the inmate that DOC would be making deductions from his inmate account to satisfy those financial obligations. *Id.* Nevertheless, DOC, consistent with its Act 84 policy, began deducting 20% of all deposits made into the inmate's account. *Id.* As a result, the inmate asserted that his due process rights were violated because he was

not afforded the pre-deprivation process required by *Montanez*. *Id.* This Court, agreeing with the Third Circuit Court's holding in *Montanez*, concluded that,

> to comply with due process, [DOC] must, prior to the first deduction: (a) inform the inmate of the total amount of his financial liability as reflected in his sentencing order, as well as [DOC's] policy concerning the rate at which funds will be deducted from his account and which funds are subject to deduction; and (b) give the inmate a reasonable opportunity to object to the application of [DOC's] policy to his account. These measures will help protect against errors in [DOC's] application of its Act 84 deduction policy without significantly impeding its ability to carry out essential functions.

*Id.* at 558-59 (citations omitted). One year later, in *Johnson v. Wetzel*, 238 A.3d 1172 (Pa. 2020), this Court extended its holding in *Bundy* to provide a post-deprivation remedy "to [all] inmates whose accounts were subject to Act 84 deductions without the benefit of pre-deprivation safeguards."[6] *Johnson*, 238 A.3d at 1182-83. In other words, this Court concluded that "where an inmate, whose Act 84 deductions began before *Bundy* and *Montanez* were decided, grieves those deductions by accurately reciting that no *Bundy* process was afforded prior to the first one, due process mandates that [DOC] afford post-deprivation process analogous to the pre-deprivation procedures required by *Bundy*." *Id.* at 1184.

While I do not necessarily disagree with the Third Circuit's decision in *Montanez* and this Court's in *Bundy*, those decisions must be cabined to their facts. The procedural due process concerns that were present in *Montanez* and *Bundy* are absent here. Unlike

---

[6] Although this Court decided *Johnson* after the General Assembly amended Act 84 in 2019, this Court's decision was based upon the pre-amended version of Act 84—*i.e.*, when DOC's Act 84 deduction rate was set by its policy at a rate of 20%. *See Johnson*, 238 A.3d at 1776. The sole issue before this Court in that case was whether an inmate, whose Act 84 deductions began in June 2013 before the Third Circuit decided *Montanez* and this Court decided *Bundy*, was entitled to some form of post-deprivation process in connection with the Act 84 deductions that DOC made from his inmate account. *See id.* at 1775. Consequently, this Court did not consider what effect, if any, the amendments to Act 84 and DOC's policy—*i.e.*, the increase in the deduction rate from 20% to 25%—had on this Court's decision in *Bundy*.

the inmate in *Bundy*, Washington does not and cannot allege that he was not provided with notice or an opportunity to be heard prior to the first Act 84 deduction from his inmate account—*i.e.* notice of the total amount of his court-ordered financial obligation, the fact that DOC would be making Act 84 deductions from his inmate account, and the rate of DOC's Act 84 deduction, as well as an opportunity to be heard and object thereto. Further, unlike the inmate in *Montanez*, Washington does not allege that DOC made an error relative to the total amount of his court-ordered financial obligation. Washington also does not allege that DOC has made any deductions from funds that are exempt, such as veterans administration disability benefits. *See Montanez*, 773 F.3d at 486. In other words, Washington was already afforded all of the process that he was due under *Montanez* and *Bundy* prior to DOC's initial Act 84 deduction from his inmate account. Washington's only challenge is to the statutorily mandated increase in the rate of DOC's Act 84 deduction from his inmate account from 20% to 25%. As explained more fully above, however, DOC's promulgation and implementation of its Act 84 policy, which simply effectuates that statutorily mandated increase in DOC's Act 84 deduction rate, constitutes a legislative action, and, therefore, due process concerns are not implicated.

Moreover, I note that, even if DOC would have provided—or following the majority's decision now provides—Washington with notice and an opportunity to be heard relative to the increase in the rate of its Act 84 deduction from his inmate account from 20% to 25%, Act 84, as amended, prohibits DOC from deducting at any rate less than the statutorily mandated minimum of 25%. As a result, no relief is available to Washington even with notice and an opportunity to be heard, a point which the majority concedes. (*See* Majority Op. at 2, 52.) Thus, through its decision today, the majority is knowingly forcing DOC to provide Washington with an administrative remedy that is no remedy at all and encouraging Washington, and other inmates in his situation, to exhaust

an administrative remedy that is essentially meaningless.[7]  This is a waste of DOC's resources.  The better course of action, and the only avenue through which Washington could possibly obtain the relief that he seeks—*i.e.*, an ability to pay hearing (*see* Washington's Br. at 6 ("While the rate of the increase might seem modest, . . . Washington lacked the funds to pay for basic hygiene items, dietary supplementation, and his legal filings."))—would be for Washington to challenge DOC's Act 84 policy as contrary to Act 84 and/or to challenge the constitutionality of Act 84 itself.

For these reasons, I dissent.

Justice Mundy joins this dissenting opinion.

---

[7] *Cf. Feingold v. Bell of Pa.*, 383 A.2d 791, 793 (Pa. 1977) ("As with all legal rules, the exhaustion of administrative remedies rule is neither inflexible nor absolute, and this Court has established exceptions to the rule.  Thus, a court may exercise jurisdiction where the administrative remedy is inadequate."); *Ohio Cas. Grp. of Ins. Cos. v. Argonaut Ins. Co.*, 525 A.2d 1195, 1198 (Pa. 1987) ("The rule requiring exhaustion of administrative remedies is not intended to set up a procedural obstacle to recovery; the rule should be applied only where the available administrative remedies are adequate with respect to the alleged injury sustained and the relief requested.").